Marty Lieberman (Bar No. 007442)
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
Tel. (602) 650-1854
mlieberman@acluaz.org

*(Additional Counsel for Plaintiffs Listed on Signature Page)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

A.I.I.L., on behalf of herself and her minor children, J.A.H.I. and M.E.H.I.; L.L.H.O., on behalf of herself and her minor child, K.E.O.H.; J.L.V.A., on behalf of himself and his minor child, D.S.V.H.; J.I.S., on behalf of himself and his minor child, B.L.S.P.; and J.J.P.B., on behalf of himself and his minor child, A.E.P.F.,

        Plaintiffs,

- v -

Jefferson Beauregard Sessions III, Former Attorney General of the United States; Gene Hamilton, Counselor to the Attorney General; John F. Kelly, Former White House Chief of Staff and Former Secretary of the United States Department of Homeland Security (DHS); Stephen Miller, Senior Advisor to the President; Kirstjen Nielsen, Former Secretary of DHS; Kevin K. McAleenan, Acting Secretary of DHS and Former Commissioner of United States Customs and Border Protection (CBP); Mark Morgan, Acting Commissioner of CBP; Thomas Homan, Former Director of United States Immigration and Customs Enforcement (ICE); Ronald D. Vitiello, Former Acting Director of ICE; Matthew Albence, Acting Director of ICE; L. Francis Cissna, Former Director of United States Citizenship and Immigration Services (USCIS); Carla Provost, Chief of CBP U.S. Border Control; Alex Azar, Secretary of the United States Department of Health and Human Services (HHS); Margaret Wynne, Former HHS Counselor for Human Services Policy; E. Scott Lloyd, Former Director of the United States Office of Refugee Resettlement (ORR); John/Jane Doe DHS Defendants; and John/Jane Doe HHS/ORR Defendants,

        Defendants.

No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## **INTRODUCTION**

1.    This action seeks damages on behalf of the immigrant children and their parents cruelly and inhumanely separated from each other in Arizona and at other places along the United States' southern border by the U.S. government.

2.    Since 2017, thousands of children, including many two years old or younger, have been torn from their parents' arms with little or no warning.  In many cases, no explanations were given as to why they were being separated, and no answers were provided as to where the children were taken.  Often, no information was given to either the child or parent about each other's whereabouts.  The separated children and parents were not told when—or even *if*—they would ever see each other again.  Many did not see each other again for a year or more.

3.    Plaintiffs J.A.H.I. ("Jaime") and M.E.H.I. ("Mateo"), then seven and eight years old, sobbed as they were pulled from the arms of their mother, Plaintiff A.I.I.L. ("Ana").[1]

4.    Plaintiff K.E.O.H. ("Karina"), then 13 years old, was forcibly separated from her mother, Plaintiff L.L.H.O. ("Lorena"), on Christmas Day, and kept handcuffed to control her as her mother was taken away and then subjected to the trauma of 16 months of separation, without any regard for her preexisting mental health issues.

5.    Plaintiff D.S.V.H. ("Diana"), then seven years old, fell asleep in a holding facility only to awake and find that her father, Plaintiff J.L.V.A. ("Jorge"), had been taken away in the night without a chance to say goodbye.

6.    Plaintiff B.L.S.P. ("Beatriz"), then three years old, was taken from her father, Plaintiff J.I.S. ("Jairo"), after watching U.S. immigration officials violently remove another

---

[1]    Plaintiffs are referred to throughout this Complaint by their initials.  We have also assigned to Plaintiffs first-name pseudonyms for ease of reference.

child from her mother.  Later, Beatriz was physically abused by her caretaker while in the custody of the U.S. government.

7.     Plaintiff A.E.P.F. ("Andrés"), then six years old, was torn kicking and screaming from the arms of his father, Plaintiff J.J.P.B. ("Jacinto"), as Jacinto struggled to make uninterested guards aware of Andrés' heart murmur.  Jacinto was deported without Andrés, and Andrés did not see his father again for nearly ten months.

8.     Before 2017, family separations at a U.S. border were exceedingly rare, and based on either a parent's medical emergency or a determination that the parent represented a danger to the child.  Beginning in or around mid-2017, however, Defendants at the highest levels of the U.S. government conspired with each other to violate the law and ordered these forcible family separations in Arizona and elsewhere along the southern border.

9.     Defendants include those U.S. government officials who ordered or participated in the planning of widespread family separations.  They did so unlawfully, for no legitimate reason, and notwithstanding that family separation does irreparable psychological and physical damage to children and parents.  Defendants destroyed families to inflict severe pain on Central American immigrants, hoping that this would cause them to abandon their asylum cases and deter other Central Americans from seeking asylum or other immigration relief in the United States.

10.     The separated children, after being taken from their parents, were detained in punitive conditions, which included being provided no means of communication with their parents for weeks or even months.  During this period, parents had no idea how their children were being cared for, or by whom.  Some parents contemplated or attempted suicide, and at least one tragically died by suicide.  Traumatized children were not provided any meaningful treatment to address the fear, isolation, and abandonment they experienced or the lasting effects of their separation and confinement.

11.     During the separations, Defendants further ignored the law and their duty to care for separated families—failing to take basic steps to protect children, maintain information on family units, or mitigate Plaintiffs' suffering while in government custody. Defendants in this action include those officials in the United States Department of Homeland Security ("DHS") charged with, among things, ensuring that information about families in their custody was properly collected and maintained so that family members who arrived together were identified as family units for data tracking (the "DHS Defendants"), as well as the government officials in the United States Department of Health and Human Services ("HHS") and the Office of Refugee Resettlement ("ORR") charged with caring for minor children after they were separated from their parents (the "HHS/ORR Defendants").

12.     Defendants' care and tracking for the separated children was so deficient that when a federal court finally ordered the government to reunify families in July 2018, government officials were unable to identify which children belonged to which parents. Children who were too young to speak had to be asked to recognize their national flags to provide a clue as to where they were from.   The federal judge who ordered the reunifications in the action *Ms. L.* v. *ICE*, No. 18 Civ. 428 (S.D. Cal.), observed that while the government could effectively track the physical property it confiscated from immigrants—money, documents, and the like—it had no system to account for the thousands of *children* who were taken from their parents.

13.     A July 2019 report from the Staff of the House Committee on Oversight and Reform (the "House Oversight Staff Report") concluded that the separations were "more harmful, traumatic, and chaotic than previously known."  The report found that children as young as a few months old had been separated from their parents, with at least 18 separated children younger than two years old.

- 3 -

14. Today, even after many—but not all—families have been reunified by a federal court order, the effects of the separations continue. Trauma during childhood impacts cognitive development and emotional growth. Increased stress during childhood can result in increased risk of disease and mental health disorders. The children—especially the young and most vulnerable—suffer when they are apart from their parents, even temporarily. Many suffer from mental health conditions that were caused or exacerbated by the separations.

15. Parents are also scarred from being deprived of the ability to protect their children, of learning of their children's suffering, and of seeing their children's continuing pain. Parents now suffer from, among other things, fear and anxiety, trouble sleeping, nightmares, painful headaches and dizzy spells, and other symptoms. These parents also now face an increased risk of exacerbating and developing mental health disorders, including severe anxiety, depression, and suicidal ideation.

16. There is scientific consensus that family separations cause extreme and lasting trauma. A report by the HHS Office of the Inspector General issued in September 2019 (the "September 2019 HHS OIG Report") found that "intense trauma" was "common" among children who entered ORR facilities in 2018, with children who had been "unexpectedly separated from a parent" facing additional trauma. According to the September 2019 HHS OIG Report, "separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated. Separated children experienced heightened feelings of anxiety and loss as a result of their unexpected separation from their parents." Some children suffered from "acute grief that caused them to cry inconsolably," "believed their parents had abandoned them," experienced "feelings of fear or guilt," and were "concerned for their parents' welfare."

17. Plaintiffs now seek redress for themselves and on behalf of their children, as well as on behalf of all those similarly situated for Defendants' violations of law, including:

the Fourth Amendment (unreasonable seizure of children); the Fifth Amendment Due Process Clause (fundamental right to family integrity; right to a hearing; right to adequate health care); Equal Protection (prohibiting discrimination on the basis of race, ethnicity, or national origin); and 28 U.S.C. §§ 1985 and 1986 (prohibiting conspiracy to violate civil and constitutional rights).[2]

18.     Although separated families can never be made whole, justice requires redress for their suffering.  Plaintiffs now seek that justice for themselves and other families like them.

## **PARTIES**

### A.     **Plaintiffs**

19.     Plaintiffs A.I.I.L. ("Ana"), J.A.H.I. ("Jaime"), and M.E.H.I. ("Mateo") are Guatemalan nationals currently residing in West Palm Beach, Florida.  Ana brings this action on behalf of herself and her minor children, Jaime and Mateo, ages eight and nine, respectively.  Ana, Jaime, and Mateo entered the United States together on May 25, 2018, and were separated in Arizona.  Ana was then detained in Arizona for approximately six weeks.  Jaime, Mateo, and Ana remained separated for about seven weeks.  They have since been granted asylum in the United States.

20.     Plaintiffs L.L.H.O. ("Lorena") and K.E.O.H. ("Karina") are Salvadoran nationals currently residing in Las Vegas, Nevada.  Lorena brings this action on behalf of herself and her minor child, Karina, age 15.  Lorena and Karina entered the United States on December 22, 2017 and were separated in Arizona.  Lorena was detained in a series of facilities in Arizona and elsewhere.  After being forcibly separated from her mother, Karina

---

[2]   In addition, the U.S. government is itself liable for, among other things, the torts of intentional and negligent infliction of emotional distress.  Plaintiffs are presenting tort claims to the appropriate federal agencies under the Federal Tort Claims Act ("FTCA"), and reserve all rights to seek leave to amend this Complaint should their FTCA claims be denied.  *See* 28 U.S.C. § 2675.

was held at Southwest Key Programs' Casa Kokopelli facility in Mesa, Arizona for approximately eight months before being transferred to foster care in New York. Karina and Lorena remained separated for approximately 16 months. They are currently pursuing asylum in the United States.

21.    Plaintiffs J.L.V.A. ("Jorge") and D.S.V.H. ("Diana") are Honduran nationals currently residing in Trenton, New Jersey. Jorge brings this action on behalf of himself and his minor child, Diana, age eight. Jorge and Diana entered the United States on June 4, 2018. After being separated from her father, Diana was held at Southwest Key Programs' facilities in Phoenix and Glendale, Arizona for approximately eight weeks. Jorge and Diana are currently pursuing asylum in the United States.

22.    Plaintiffs J.I.S. ("Jairo") and B.L.S.P. ("Beatriz") are Guatemalan nationals currently residing in Santa Isabel, Guatemala. Jairo brings this action on behalf of himself and his minor child, Beatriz, age five. Jairo and Beatriz entered the United States on December 24, 2017 and were separated in Arizona. Jairo was detained in facilities in San Luis and Florence, Arizona.

23.    Plaintiffs J.J.P.B. ("Jacinto") and A.E.P.F. ("Andrés") are Honduran nationals currently residing in Fort Wayne, Indiana. Jacinto brings this action on behalf of himself and his minor child, Andrés, age seven. Jacinto and Andrés entered the United States on May 16, 2018 and were subsequently separated for about ten months. Jacinto and Andrés are currently pursuing asylum in the United States.

24.    Plaintiffs bring this action on their own behalf and as a class action on behalf of all others similarly situated (the "Class Members").

**B.    Defendants**

25.    Defendants, sued in their individual capacities, are as follows:

i.    *The "DOJ Defendants"*

26.    Defendant Jefferson Beauregard Sessions III was Attorney General of the United States from February 9, 2017 to November 7, 2018.  During that time period, he oversaw the administration of the immigration laws, including by overseeing the Executive Office for Immigration Review (EOIR).

27.    Defendant Gene Hamilton is a Counselor to Attorney General William Barr. Previously, beginning in or about October 2017, he was a Counselor to Attorney General Sessions.  He advised Sessions on immigration policy and practice.  Prior to that position, Hamilton was a senior counselor to the Secretary of DHS.

ii.    *The "White House Defendants"*

28.    Defendant John F. Kelly was White House Chief of Staff from July 31, 2017 to January 2, 2019.  Before that, he was Secretary of DHS from January 20, 2017 to July 31, 2017.  As Secretary of DHS, he oversaw enforcement and administration of the immigration laws, and directed all DHS component agencies, including U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP").  He had ultimate authority over all ICE and CBP procedures and practices relating to immigrant detention, including ensuring that all individuals in detention were held in accordance with the law.  In that role, he first presented the idea of family separations to the U.S. public in March 2017.  Subsequently, as Chief of Staff, Kelly advised President Trump on all aspects of immigration policy and practice, including the detention of asylum seekers and forcible separation of children and parents.

29.    Defendant Stephen Miller is a Senior Advisor to the President of the United States.  He has advised the President since his inauguration on January 20, 2017.  Miller

advises President Trump on immigration—including the detention of asylum seekers and forcible separation of children and parents.

### iii.  *The "DHS Defendants"*

30.    Defendant Kirstjen Nielsen was Secretary of DHS from December 6, 2017 to April 10, 2019.  She oversaw enforcement of the immigration laws, and directed all DHS component agencies, including ICE and CBP.  During that time, she had ultimate authority over all ICE and CBP procedures and practices relating to immigrant detention, including ensuring that all individuals in detention were held in accordance with the law.  Prior to becoming Secretary of DHS, from September 6, 2017 to December 6, 2017, Nielsen was White House Principal Deputy Chief of Staff to then–White House Chief of Staff John F. Kelly.  Before that, from January 20, 2017 to July 31, 2017, Nielsen was Chief of Staff to John F. Kelly while he was Secretary of DHS.

31.    Defendant Kevin K. McAleenan is the Acting Secretary of DHS, a position he assumed on April 11, 2019.  Before that, he was the Acting Commissioner of CBP from January 20, 2017 to March 20, 2018 and then Commissioner of CBP from March 20, 2018 to April 11, 2019.  In these roles, McAleenan had direct authority over all CBP procedures and practices relating to CBP immigration enforcement operations and facilities, including ensuring that CBP's arrest and detention of individuals is in accordance with the law.

32.    Defendant Mark Morgan is the Acting Commissioner of CBP, a position he assumed on July 7, 2019.  Before that, he was the Acting Director of ICE from May 28, 2019 to July 5, 2019.  As the Acting Commissioner of CBP, Morgan has direct authority over all CBP procedures and practices relating to CBP immigration enforcement operations and facilities, including ensuring that CBP's arrest and detention of all individuals is in accordance with the law.

33.    Defendant Thomas Homan was Acting Director of ICE from January 30, 2017 to June 29, 2018.  Homan had authority over all ICE procedures and practices relating

to ICE enforcement operations and detention facilities, including ensuring that all detainees in ICE custody are held in accordance with the law.

34.    Defendant Ronald D. Vitiello was Acting Director of ICE from June 30, 2018 to April 12, 2019.  As Acting Director, Vitiello had authority over all ICE procedures and practices relating to ICE enforcement operations and detention facilities, including ensuring that all detainees in ICE custody are held in accordance with the law.  Before that, Vitiello was the Acting Deputy Commissioner of ICE from April 25, 2017 to June 29, 2018 and then Deputy Commissioner of ICE from June 30, 2018 to April 12, 2019, and Chief of the United States Border Patrol from February 1, 2017 to April 25, 2017.

35.    Defendant Matthew Albence is Acting Director of ICE, a position he assumed on July 5, 2019.  Before that, he was Deputy Director of ICE from August 2018 until July 5, 2019, and the Executive Associate Director for Enforcement and Removal Operations from February 2017 until August 2018.  As Acting Director, Albence has authority over all ICE procedures and practices relating to ICE enforcement operations and detention facilities, including ensuring that all detainees in ICE custody are held in accordance with the law.

36.    Defendant L. Francis Cissna was Director of U.S. Citizenship and Immigration Services ("USCIS") from October 8, 2017 to June 1, 2019.  As Director of USCIS, Cissna had authority over all asylum and refugee applications, and was responsible for ensuring that asylum and refugee seekers were afforded due process of law.

37.    Defendant Carla Provost has been Chief of United States Border Patrol at CBP since August 9, 2018.  As the Chief of Border Patrol, she ensures that CBP officers act in accordance with the law.  Before that, Provost was the Deputy Chief of United States Border Patrol from October 26, 2016 until she was promoted to Acting Chief of United States Border Patrol in April 2017, a position she held until she became Chief in August 2018.

38.    "John/Jane Doe DHS Defendants" were employed by DHS and its component agencies, including CBP and ICE, and their identities are at this time unknown to Plaintiffs.  They were responsible for ensuring the appropriate care of children and parents in their custody.  Their responsibilities required at least in part, ensuring that: children were not unlawfully separated from their parents; apprehensions and processing of individuals who cross the border were carried out lawfully; information collected from immigrants in their custody was properly collected and maintained so that family members who arrived together were identified as family units for data tracking purposes; detention facilities did not impose punitive conditions; individuals in their care had adequate health care and were able to pursue immigration relief as permitted by law; and ensuring that all of their duties and responsibilities were conducted and carried out in accordance with the law.  When and if the identities of John/Jane Doe DHS Defendants become known, Plaintiffs may amend this Complaint to add specific officers, employees, or agents as named Defendants.

iv.    *The "HHS/ORR Defendants"*

39.    Defendant Alex Azar is the Secretary of the Department of Health and Human Services, a position he has held since January 29, 2018.  Azar is charged with the care and custody of children placed into the custody of the Office of Refugee Resettlement, a division of HHS.

40.    Defendant Margaret Wynne was at all relevant times and is now Counselor for Human Services Policy of HHS.  Wynne is involved in conducting policy research, analysis, evaluation, and coordination across HHS, including ORR.

41.    Defendant E. Scott Lloyd was Director of ORR from March 2017 to November 2018.  As Director, Lloyd was charged with the care and custody of children placed into the custody of ORR, including their reunification with a legal parent or

guardian.  Lloyd was also responsible for ensuring that the care and custody of children placed into the custody of ORR was in accordance with the law.

42.    "John/Jane Doe HHS/ORR Defendants" were employed by HHS and its component agencies, including ORR, and their identities are at this time unknown to Plaintiffs.  Their responsibilities included, among other things, ensuring the appropriate care, safety, and well-being of children in their custody following separation from their parents.  When and if the identities of John/Jane Doe HHS/ORR Defendants become known, Plaintiffs may amend this Complaint to add specific officers, employees, or agents as named Defendants.

43.    Together, the HHS/ORR Defendants were responsible for ensuring the appropriate care of children in their custody and detaining minor children in the least restrictive setting appropriate to the minor's age and special needs, and ensuring that children in their custody are not unlawfully kept apart from their parents.

## JURISDICTION AND VENUE

44.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Plaintiffs' claims arise under the Fourth and Fifth Amendments to the United States Constitution, *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C. §§ 1985 and 1986.

45.    Venue is proper in the United States District Court for the District of Arizona under 28 U.S.C. § 1391(b) because, while separations occurred all along the southern border, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, in particular at CBP border stations in Nogales and San Luis, Arizona; detention centers in Phoenix, Camp Verde, and Eloy, Arizona; facilities under contract with ORR to hold children, including in Mesa, Arizona; and during transit between these locations and elsewhere.  Upon information and belief, similar events or omissions

concerning other Class Members occurred at other such facilities in this District and elsewhere as well.

46.    Arizona's more than 370-mile-long border with Mexico is the location for a substantial portion of entries into the United States from Mexico, both with and without inspection.

47.    The Arizona border has several official ports of entry, including the San Luis, Lukeville, Sasabe, Nogales, DeConcini, Naco, and Douglas ports of entry.    Upon information and belief, many Class Members entered the United States at or around each of these ports of entry.

48.    CBP has a number of Border Patrol Stations in Arizona, including the Ajo, Wilcox, Sonoita, and Brian A. Terry stations in the Tucson Sector, and the Blythe, Wellton, and Yuma stations in the Yuma Sector.  Upon information and belief, many Class Members were held and/or separated from their family members at these facilities.

49.    A number of ICE detention centers are located in Arizona, including the Central Arizona Detention Center in Florence, the Florence Correctional Center in Florence, and the Eloy Detention Center in Eloy.  Upon information and belief, many Class Members were detained at these facilities.

50.    Unaccompanied children, including those separated from their parents, have been housed in numerous Arizona-based facilities, including at least eight Southwest Key Program Inc. foster care centers in the Phoenix and Tucson areas, two facilities operated by A New Leaf, Inc. in the Phoenix area, and a facility operated by VisionQuest National in Tucson.  Upon information and belief, many of Plaintiffs' children were held at or placed through these facilities.

## I.     PLAINTIFFS' FACTUAL ALLEGATIONS.

### A.     Background on Federal Immigration Law and Practice.

51.     Noncitizens who come to the United States, whether or not at a designated port of entry, may apply for asylum, withholding of removal, or other immigration relief. *See* 8 U.S.C. § 1158(a)(1); *see also* 8 U.S.C. § 1225(b).

52.     The protections of the Fourth and Fifth Amendments to the United States Constitution—including the rights to be free from unreasonable seizures, the right to Equal Protection, and the right to family integrity—apply to all persons present in the United States.

53.     Various federal agencies are involved when a noncitizen (child or adult) is detained.

54.     First, the noncitizen is typically brought to a CBP facility near the border, which is intended to be a short-term holding facility.

55.     Next, adults who remain in custody are typically transferred from CBP to ICE custody, where they may be held in longer-term ICE detention facilities, removed, or released under supervision pending legal proceedings.[3] Prior to Defendants' use of forced family separations beginning in or about mid-2017, upon arrival in the United States, a child was typically separated from a parent or legal guardian only where there were specific concerns that the parent represented a danger to the child or was otherwise unfit.  *See generally Ms. L.* v. *ICE*, 302 F. Supp. 3d 1149, 1161 (S.D. Cal. 2018).

---

[3]     Noncitizens without valid status who cross the U.S. border may be prosecuted for misdemeanor improper entry under 8 U.S.C. § 1325.  8 U.S.C. § 1326 criminalizes illegal re-entry as a felony for noncitizens who, after having been denied admission, or were excluded, deported, or removed, then enter, attempt to enter, or are found in the United States.  Over the last 20 years, less than one-third of apprehensions by CBP have resulted in criminal prosecutions under these statutes, and any sentences imposed tend to be short, ranging from two to fifteen days.

56.    ORR is the federal agency tasked with overseeing the care and custody of children under 18 years old without immigration status who enter the United States, and have neither a parent nor a legal guardian in the country, or who are taken away from their parents or guardians.  Such children have been deemed "unaccompanied alien children," or "UACs"—even when they arrived in the United States with a parent but were forcibly taken from that parent.

57.    Pursuant to federal law, certain protections apply to UACs in ORR custody. Among other things, they are supposed to receive care and be in contact with family members.  Applicable standards require that DHS and HHS hold minors in facilities that are "safe and sanitary," consistent with the agencies' "concern for the particular vulnerability of minors."  No matter where they are detained, whether in CBP or ORR custody, children must be provided toilets and sinks, water and food, medical assistance, adequate temperature control and ventilation, supervision necessary to protect them from others, and "contact with family members."  *Flores* v. *Reno*, Stipulated Settlement Agreement, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997).

58.    The William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. 110-457, 122 Stat. 5044 (2008), permits ICE or CBP, absent exceptional circumstances, to detain unaccompanied children for only up to 72 hours to allow ORR to locate an appropriate facility or attempt to place the child with available parents or legal guardians.  *See generally* 8 U.S.C. §§ 1232(c)(2)–(c)(3).  Otherwise, ORR must locate relatives, friends, or caretakers in the United States to serve as sponsors and care for the children during the pendency of their immigration proceedings.  *Id.*

### B.    Mateo, Jaime, and Ana.

59.    Mateo and Jaime were seven and eight years old, respectively, when they came to the United States with their mother, Ana.  Ana and her sons fled Guatemala to seek asylum in the United States after suffering years of extreme violence and abuse, including

- 14 -

violence motivated by hostility toward Ana's Evangelical Christian religious beliefs and practices.  Ana knew that escaping Guatemala was the only way to ensure her and her children's safety.  The family left Guatemala for the United States together on or about May 20, 2018.

60.    On May 25, 2018, Jaime, Mateo, and Ana crossed the border into the United States near San Luis, Arizona.  With a high temperature that day of over 95 degrees, Jaime, Mateo, and Ana were exhausted, hungry, and dehydrated.  Mateo, seven years old, was in particularly bad shape.  He had been sick through much of the trip and had vomited so many times that he began vomiting blood.  At the time CBP officers took Mateo into custody, blood and vomit caked his and his mother's clothing.  Earlier that day, Ana had accidentally ripped a gaping hole in her pants, leaving her crotch area exposed.

61.    The CBP officers took Jaime, Mateo, and Ana into custody and drove them to a nearby CBP border processing station.  The officers placed Ana and the boys in a crowded hallway, packed shoulder-to-shoulder with other immigrant families.  Although Mateo was clearly ill, and Jaime, Mateo, and Ana showed obvious signs of heat exhaustion, no CBP officer offered them water or medical attention.  Eventually, an officer gave a drink to Mateo, who lay exhausted on the floor.  Neither Ana nor Jaime was offered anything. And although Ana's clothing was torn and covered in blood and vomit, she was offered no other clothing or covering.  Ana was humiliated to be exposed in a room full of strangers.

62.    An hour or so after their arrival at the center, a Spanish-speaking officer told Ana that her children would be taken from her and gave her five minutes to say goodbye. The boys began to cry uncontrollably and hugged Ana tight, desperate to stay with her.  As Mateo sobbed and clung to his mother, Jaime, just one year older, tried to console Mateo— while crying himself.  Ana, in shock and scared, tried to comfort her boys.  But she had little to say to soothe them because she had no idea what was going to happen.  She tried

to plead with the guards to allow her to keep her children.  The guards took Jaime and tore Mateo from Ana's arms as he tried to cling to her.

63.    Ana was inconsolable and terrified to think of what would happen to her little boys.  The agents gave no explanation for the separation, and refused to give her information as to where her boys were taken, how or by whom they would be cared for, or how or even whether she could communicate with them.  She had no idea when—or even if—she would see them again.

64.    Ana soon realized that the same thing happened to many of the other children and parents who had occupied that hallway.  Ana could hear wails through the center as one family after another was separated.

65.    The children were moved to a different section of that same center, where they stayed for the next four days.  The boys spent those days in the freezing-cold holding area referred to as the "*hielera*" or "icebox."  They slept on the cold ground covered only by Mylar emergency blankets.  Jaime and Mateo spoke no English, had no idea where they were going, what would happen to them, or whether they would ever see their mother again.  They were eventually transferred to ORR custody.

66.    Ana was soon driven to another facility in Arizona.  There, she spent nearly two weeks in an *hielera* among dozens of other separated mothers, with no pillow, no bed, and no opportunity to bathe, brush her teeth, or to change out of her blood- and vomit-covered clothing.  She repeatedly sought information from the guards as to her children's well-being, but was provided only vague statements that her children would be put in a shelter.  That meager information was provided only after Ana pleaded with a guard, asking him, "Don't you have a wife or a daughter?"

67.    At this second facility, Ana was given a meal of hard ramen noodles twice a day.  Instead of being cooked in boiling water, the hard noodles were put raw in lukewarm water.  Ana prayed and sought comfort by sharing hymns with other separated mothers.

The guards at this facility mocked Ana and her fellow detainees; they berated them in Spanish for coming to the United States and called Ana a "dirty Guatemalan." They accused Ana of using her young children as a "passport" and joked in front of her that her sons would be shipped off to serve in the U.S. Army. One guard told Ana that her boys would stay "with Donald Trump," while she would be deported back to Guatemala alone. During her nearly two weeks in the *hielera*, Ana had no contact with her children, no idea where they were, no information about their health, and no idea whether or when she would see them again.

68.    Ana was eventually transferred to the Eloy Detention Center in Arizona.

69.    At some point during her stay at Eloy Detention Center, Ana was handed slips of paper with tracking numbers for her and her sons' backpacks, which had been confiscated by federal agents at the border. Although provided information about her children's backpacks, she was provided no information about her actual children.

70.    Desperate to talk to her boys, Ana submitted a formal request to ICE for information. A few days later—now three weeks into their separation—she was told that her boys had been flown thousands of miles away, and were being held at a shelter in Miami, Florida. Ana was finally able to speak with her children by phone, but the calls were so expensive that she could afford only short, infrequent calls. When they did speak, the boys cried, begged to see her, and wanted to know why she could not be with them.

71.    Ana was finally released on bond on or around July 6, 2018. To the best of her knowledge, she was never criminally charged in connection with her entry into the United States. With the assistance of her immigration attorney, Ana traveled to Florida to be reunited with her children. On or around July 10, 2018, seven weeks after guards had taken Mateo and Jaime from Ana, the family was reunited at the Miami shelter. The initial reunion was difficult. Ana had lost 15 pounds from malnutrition during her detainment, and her face had broken out from an allergic reaction. Ana's appearance had so changed

- 17 -

that the boys at first did not seem to recognize their mother.  It was not until Ana spoke that the boys realized who she was.

72.    The boys remained detained at the shelter and separated from their mother for approximately three more days, while the government processed paperwork for their release.  On or around July 13, 2018, the children were finally released into their mother's custody.

73.    The family is now living together in West Palm Beach, Florida.  Because an immigration judge held that Ana and her sons had a well-founded fear of persecution if forced to return to Guatemala, Ana was granted asylum on March 29, 2019, and the boys were granted asylum on May 7, 2019.

74.    Ana, Mateo, and Jaime continue to suffer from the trauma of separation. Among other things, Mateo, the younger boy, struggles with being apart from his mother for even brief periods; he is often sad and cries much more than he previously did; and he can no longer sleep or bathe alone.  Jaime shows his trauma by acting out in anger, anger that was uncharacteristic before the separation.  Both Mateo and Jaime are now extremely suspicious of strangers.

75.    The only reason the family was reunited was because a federal judge in San Diego in the *Ms. L.* case ordered the reunification of separated families.  *See Ms. L.* v. *ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

**C.    Karina and Lorena.**

76.    Karina is the 15-year-old daughter of Lorena.  Karina and Lorena fled extreme violence in El Salvador.  After a man nearly beat Lorena to death, he spent a mere three days in jail.  The man continued to physically threaten Lorena and attempted to have her daughter kidnapped from school.

77.    In November 2017, then 13-year-old Karina and Lorena fled to the United States.  Karina and Lorena arrived in Nogales, Arizona on December 22, 2017 and

presented themselves to CBP officers at the DeConcini Port of Entry as asylum seekers. They were taken into CBP custody and placed in an *hielera*. That evening, a Spanish-speaking CBP officer in a blue uniform approached Lorena and asked a series of questions. Upon learning where she was from, he mocked Lorena in profane terms, saying, "Fuck these Salvadorans," which drew a laugh from other officers in the room.

78. Karina and Lorena spent the next three days together in *hieleras* in three different facilities in or around Arizona. During their first night in detention, in Nogales, Karina and Lorena were placed in a caged holding area too small for the dozens of adults and children it contained. There were no beds. Adults slept on metal benches that ran along the cell's perimeter, while children slept on floor cushions. The *hielera* was freezing. The guards had taken away Karina's and Lorena's sweaters, leaving them in their t-shirts and shorts with only Mylar emergency blankets. There was no opportunity for Karina and Lorena to bathe, brush their teeth, or change clothes. Karina and Lorena were served hard ramen noodles that, instead of being cooked in boiling water, were placed raw in lukewarm water. Some children in the cell threw up after eating the ramen, but the guards made no effort to clean up their vomit, and did nothing to determine whether and how seriously the children were ill.

79. After so many moves in so short a time in a strange country, Karina and Lorena were disoriented. After one night in Nogales they were moved to a facility that they believe was in New Mexico because Lorena glimpsed a "Welcome to New Mexico" sign from the window of the transport van. After one night there, they were moved to a facility in Phoenix. Lorena and Karina were separated in Phoenix.

80. On Christmas morning, December 25, 2017, Karina woke up to the sound of officers calling her name. Karina hoped that they might be released. Instead, ICE officers informed Karina and Lorena that they would be separated. The officers took Lorena out

of the room, and she was given no opportunity to say goodbye to her daughter. Karina watched through a window as ICE officers put Lorena in handcuffs.

81.    As the officers led Lorena away, she saw Karina crying and making heart signs with her hands through the glass. Lorena had no idea what was happening, and she did not know when, or even if, she would see her daughter again. Karina was kept handcuffed for the next two hours to control her, as she fought to be reunited with her mother.

82.    Lorena was then readied for transport to Yavapai County Jail in Camp Verde, Arizona. Officers shackled Lorena at her ankles too tightly and refused to loosen the cuffs. During the trip to Yavapai, the driver took a fast turn, and Lorena fell to the vehicle floor. By the time Lorena arrived at Yavapai, her ankle was swollen, and she was in severe pain. To the best of her knowledge, Lorena was never charged in connection with her entry into the United States.

83.    After spending one night each at the Yavapai County Jail and the Florence Correctional Center, Lorena was transferred to Eloy Detention Center in Arizona. She was detained there for another three months.

84.    For weeks after her separation from Karina, and despite her repeated requests to ICE officers, Lorena was not provided with any information as to her daughter's location, nor was she allowed to speak with her.

85.    Lorena was devastated by the separation. She developed insomnia, dizzy spells, lack of appetite, and hair loss. When she was able to sleep, Lorena had frequent nightmares about losing her child. Lorena already suffered from chronic headaches, and the stress exacerbated her condition.

86.    Lorena's questions and requests to immigration officials were met with silence or misrepresentations and lies. In early 2018, ICE officers told Lorena—falsely— that asylum was no longer available to adults from El Salvador. ICE officers also made

Lorena sign an English-language form without explaining it to her.  Unbeknownst to her, the form she signed approved her removal.  She was then told that consenting to removal was the only path to reunification with her daughter.  Desperate to see Karina again, and relying on this false representation, Lorena told an immigration judge at a March 2018 hearing that she consented to removal.  Still, Lorena was not permitted to see her daughter.  On March 21, 2018, Lorena was deported to El Salvador, alone.  Lorena's decision to consent to removal was the result of coercion and was an involuntary waiver of her rights.

87.    During their separation, Karina was detained for approximately eight months at Southwest Key Programs' Casa Kokopelli facility in Mesa, Arizona.  She was then flown across the country, to the Cayuga Centers in the Bronx, New York, and placed with a foster family.  A staff member at Casa Kokopelli in Mesa, Arizona berated Karina, saying she should agree to be deported and should go back and tell Salvadoran kids not to come to the United States.  Also while at Casa Kokopelli, Karina was a witness to frequent verbal abuse of children by staff, and, in one instance, saw a staff member drag another child by the ear.

88.    Karina suffers from depression and anxiety, and she was not provided with appropriate mental health care to help her to handle the trauma of being separated from her mother.  After months of separation and with no end in sight, Karina contemplated suicide.  In a contemporaneous journal entry, Karina wrote that even though she knew her mom loved her, she wanted to kill herself.

89.    Karina and Lorena were separated for 16 months and were reunited only after Lorena returned to the United States.

90.    Karina and Lorena continue to suffer from the trauma of separation.  In addition to her mental health problems, Karina is now cautious, suspicious around strangers, and quick to anger.

91.    Karina and Lorena are currently in the process of pursuing asylum or withholding of removal.

**D.    Diana and Jorge.**

92.    Diana is the eight-year-old daughter of Jorge.  In May 2018, then seven-year-old Diana fled Honduras with her father after various family members had been subjected to death threats, intimidation, and violence.  Diana and Jorge entered the United States on June 4, 2018.  Jorge immediately turned himself over to border agents and indicated that he and Diana were seeking asylum in the United States.

93.    Diana and Jorge were taken to an *hielera* and placed in a small cell with four other parent-child pairs.  The cell was filthy and smelled of urine.  The toilet was fully exposed.  When Diana had to use the toilet, Jorge held up his Mylar emergency blanket as a makeshift curtain to try to provide his young daughter some privacy.  They were not provided with mats, pillows, or blankets other than the Mylar emergency blankets.  The children slept on benches while the adults slept on the concrete floor.

94.    Shortly after midnight, while Diana was sleeping, a CBP officer in a green uniform took Jorge out of the cell.  Jorge assumed the officer would ask him some questions and then he would return to his daughter.  Once Jorge was out of the cell, however, the CBP officer told Jorge to put his hands against the wall and to spread his legs.  The officer put cuffs on his wrists and ankles.  Jorge was not given an opportunity to say goodbye to the sleeping Diana.  Jorge begged the officer to tell him what would happen to his daughter, but his pleas fell on deaf ears.

95.    Jorge was taken on a short drive to the first of the three detention facilities in which he would be held over the next eight weeks.  In the meantime, Diana woke up that morning terrified to find her father was missing.  She had no idea where he had been taken or what this meant for her.  Diana was soon transferred to ORR custody and taken to a Southwest Key facility in Phoenix, Arizona.  Approximately one month later, she was transferred to another Southwest Key facility in Glendale, Arizona.

96.    No one provided Jorge information as to Diana's location or well-being despite his repeated requests for information and an opportunity to speak with his daughter. Jorge experienced a deep despair, weeping daily. While Jorge had previously experienced relatively mild headaches, those headaches became debilitating during the separation. The pain would grow so intense at times that he would cry out in agony. The headaches were accompanied by dizzy spells, nausea, vomiting, loss of appetite, and insomnia. Despite repeated requests, Jorge received no medical care.

97.    But for luck, Jorge would have gone longer without communicating with Diana. About eight weeks after their separation, one of Jorge's fellow detainees was on the phone with his daughter, from whom he had also been separated and who was in ORR custody. That detainee's daughter asked her father to check if anyone with Jorge's name was detained with him. The detainee then called out Jorge's full name to those detained with him. Jorge quickly identified himself, took the phone, and heard Diana on the line.

98.    Jorge and Diana were reunified a few days later. But Diana did not greet Jorge with the unqualified joy that Jorge expected. Instead, when he hugged Diana, he found her body limp, and she did not hug him back. During their separation, Diana had developed an attachment to her shelter social worker, and she did not want to leave her. Jorge was devastated to see how emotionally damaging the separation had been for his daughter.

99.    Jorge and Diana continue to suffer from the trauma of separation. Among other things, for months after their reunion, Diana experienced separation anxiety. She struggled being apart from her father at any time day or night and worried that they would be separated again. She remains deeply suspicious of strangers.

100.    Diana and Jorge are currently in the process of pursuing asylum or withholding of removal.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### E.    Beatriz and Jairo.

101.    Beatriz is the five-year-old daughter of Jairo.  In December 2017, a then three-year-old Beatriz and her father fled Guatemala for the United States.  On December 24, 2017, Beatriz and Jairo entered the United States in Arizona.  Jairo was physically exhausted from carrying Beatriz.  He had not eaten in over a day, having fed Beatriz their remaining food.

102.    Once Jairo and Beatriz were in CBP custody, a CBP officer berated Jairo for crossing the border with his daughter and accused him of trying to use Beatriz as a ticket into the United States.  The CBP officer told Jairo that he would be deported and that his daughter would be taken away from him and kept in the United States.

103.    Beatriz and Jairo were placed into a small holding cell so overcrowded with parents and children that there was no room to lay down.  As a result, Jairo attempted to sleep sitting up on the ground while Beatriz slept in his arms.  Like other plaintiffs, Beatriz and Jairo were given no food in the *hielera* other than uncooked ramen noodles in lukewarm water.  Beatriz struggled to eat and developed a severe stomachache and diarrhea.

104.    Early in the morning of December 26, 2017, guards took Beatriz and Jairo from the holding cell into a separate room along with two other sets of parents and children. In that room were two U.S. government officials.  The officials told the first mother in the group to turn over her young child.  When that mother refused, the government officials brought in four CBP officers.  When the mother still refused to give up her child, the CBP officers violently removed the frightened, crying child from her arms.  One officer repeatedly struck the woman with his hands.  Another officer grabbed the child when the battered mother could no longer resist.

105.    Beatriz watched this violence in horror and clung to her father.  With the first separation accomplished, one of the officers turned to Jairo and the other father in the room

and told them to give up their children.  Jairo understood that he could be subjected to similar violence if he resisted, so he let Beatriz go, both of them crying.  The other father did the same.  The children were taken away, and the parents returned to their holding cells.

106.    After being separated from Beatriz, Jairo was taken to an immigration detention center in San Luis, Arizona and then to another detention center in Florence, Arizona.  While in detention, Jairo struggled to sleep and suffered from horrible headaches.  During that time, he developed pneumonia and had severe pain around the site of a prior operation.  The doctor who treated him in detention told him that the extreme stress he experienced from his separation from his daughter may have contributed to his illnesses.

107.    Jairo was deported to Guatemala in mid-January 2018.  Prior to being deported, an ICE officer gave Jairo documents in English to sign.  Jairo did not understand what the documents said, but the officer told him that he would be deported whether or not he signed and that he would see his daughter sooner if he signed.  In fact, Jairo would not see Beatriz for another five months until she was finally sent back to Guatemala to be reunited with Jairo and his wife, Beatriz's mother.

108.    While Jairo was detained in Arizona, Beatriz was taken thousands of miles away and placed in ORR custody in New York.  When Beatriz returned to Guatemala, Jairo noticed a scar on her back and bruises on her legs.  When Jairo asked Beatriz what happened, Beatriz told him that a woman in New York [where Beatriz was in ORR custody] had hit her with the hard part of a belt.

109.    Jairo and Beatriz continue to suffer from the trauma of separation.  Among other things, prior to the separation, Beatriz spoke Mam, a Mayan language spoken in the area in Guatemala where she was born.  Because she was not around Mam speakers for the six months she was in ORR custody, she had mostly lost her ability to speak and understand Mam by the end of that time.  As a result, she struggled to communicate with family members back in Guatemala, including her mother, who speaks Mam exclusively.

110.    Beatriz struggled in other ways as well.  She was uncomfortable being around her parents after they were reunited, almost as if they were strangers to her, and had trouble following instructions from them.  And she is now more inclined to throw temper tantrums than she was prior to the separation.

**F.    Andrés and Jacinto.**

111.    Andrés is the seven-year-old son of Jacinto.  In May 2018, a then six-year-old Andrés fled Honduras with his father after his father's life was threatened.  Andrés and Jacinto entered the United States on May 16, 2018.  After entering, Jacinto sought out border agents to turn himself in and seek asylum.

112.    On May 17, 2018, after Andrés and Jacinto were held together in an *hielera* overnight, CBP officers in green uniforms came into the cell to take Andrés from Jacinto.  Andrés became hysterical, clinging to his father and begging him not to let the guards take him away.  The officers offered no explanation, telling Jacinto and Andrés only that they could do things the "easy way" or the "hard way."  Although Jacinto protested, the officers pulled Andrés kicking and screaming out of his arms.  Jacinto thrust Andrés' birth certificate at the officers, to prove that he was Andrés' father, but the officials ignored him.

113.    The officers then forced Jacinto to face and hold his hands against the wall so that he could not watch Andrés being taken away.  In that moment, an officer told Jacinto that his son now "belonged to Trump."  Jacinto yelled to the officers taking Andrés that Andrés had a heart murmur.  The officers asked no questions and were uninterested in Andrés' medical condition.

114.    Jacinto was then taken into a different holding area, where he sat, weeping.  No one explained why his son was taken from him, he received no information about Andrés' whereabouts, and he had no idea when, or if, he would see Andrés again.  A guard mocked him for crying "like a little girl."  The guard then told Jacinto that he would see his son in three days, which was a lie.

115.    In fact, Jacinto did not see Andrés for ten months.  Andrés was transferred to ORR custody and placed with a foster family in the Bronx, New York.  Jacinto finally spoke to Andrés a few weeks after their separation, at which time he learned that the foster parents had Andrés call them "Mom" and "Dad."  Jacinto feared that these strangers were trying to take his place as Andrés' father.

116.    Over the months that Jacinto and Andrés remained separated, their communications were restricted, with Jacinto allowed one ten-minute call every eight days.

117.    To the best of his knowledge, Jacinto was never criminally charged in connection with his entry into the United States.

118.    Jacinto was deceived by ICE officials into agreeing to removal.  An ICE officer convinced Jacinto to sign a document, written in English, a language Jacinto could not read, by telling Jacinto that signing it was necessary for his asylum case.  After he signed, the officer laughed and told Jacinto he had just agreed to his own removal.  Jacinto's decision to sign these papers was the result of coercion and was an involuntary waiver of his rights.

119.    Jacinto was deported in late May 2018.  As he was taken to the airport, an immigration officer assured him that Andrés would be waiting at the airport to fly with him back to Honduras.  But when Jacinto arrived at the airport, his son was not there.  Instead, Andrés remained thousands of miles away in the Bronx, in the care of two strangers he was told to call "Mom" and "Dad."

120.    Jacinto would not see Andrés again for nearly a year, and only after Jacinto returned to the United States.

121.    Jacinto and Andrés continue to suffer from the trauma of separation.  Andrés now acts out more than he did before his separation from his father, has a short temper, and cries frequently.  He also has difficulty being apart from Jacinto.

122.    Jacinto and Andrés are currently in the process of pursuing asylum or withholding of removal.

## II.    THE FAMILY SEPARATION CRISIS BEGINS.

### A.    In Early 2017, Defendants Unlawfully Conspired to Separate Families, Based on Discriminatory Animus.

123.    In or around early 2017, Defendants Kelly (then Secretary of DHS and future White House Chief of Staff), Miller (Senior Advisor to the President), Nielsen (then Kelly's Chief of Staff and future Secretary of DHS), Hamilton (then Counselor to Attorney General Sessions), and Cissna (then Director of USCIS) began discussing the possibility of separating families at the southern border as a means to punish Central American immigrants and to discourage more Central Americans from applying for asylum in the United States.

124.    The concept of separating families was introduced broadly by DHS Asylum Chief John Lafferty, in a closed-door town hall event for DHS officials on February 2, 2017.

125.    Two weeks later, on February 14, 2017, representatives from ORR, the Department of Justice ("DOJ"), and DHS met in Washington D.C. to discuss separating families at the southern border.  Upon information and belief, each of the White House, DOJ, DHS, and HHS/ORR Defendants either attended the February 14, 2017 meeting, was briefed on it, or learned in the course of his or her work that widespread family separations were being contemplated.  Upon information and belief, certain John/Jane Doe DHS Defendants and John/Jane Doe HHS/ORR Defendants were also in attendance or were made aware of the content of this meeting directly or through the course of their work.

126.    Commander Jonathan White of the U.S. Public Health Service (then Deputy Director of ORR's UAC Program) attended the February 14 meeting.  Commander White was alarmed that widespread family separations were being considered.  He repeatedly

warned other federal officers about the harm separations would have on children. Commander White raised several specific concerns: Widespread family separations would risk unnecessary emotional harm to children, would contravene ORR's duty to act in the best interest of children, and would cause a capacity issue for ORR due to lack of bed space—*particularly for children under the age of five.*  Commander White later testified before Congress that he raised these concerns to high-level HHS officials.   Upon information and belief, Commander White warned HHS/ORR Defendants Azar, Wynne, and Lloyd—among others—about the traumas of family separation.

127.   On March 3, 2017, Reuters reported that, according to three government officials, DHS was considering a proposal to separate "women and children" crossing the U.S. border.

128.   Three days later, on March 6, 2017, Kelly, then Secretary of DHS, was asked about the proposal in an interview on CNN.  He confirmed that he and DHS were considering the proposal and specifically described the proposal to separate families along the southern border as part of an effort to exclude immigrants from Central America.  Kelly said, "Yes, I am considering [separating families] in order to deter more movement along this terribly dangerous network.  I am considering exactly that.  They [children] will be well cared for as we deal with their parents."

129.   Upon information and belief, Kelly was referring to discussions that included Defendants Nielsen, Miller, and Hamilton.

130.   Kelly's March 6, 2017 televised statements were publicly condemned, and numerous constituencies objected to the pursuit of widespread family separations as unconstitutional and severely traumatic.

131.   For example, the American Academy of Pediatrics ("AAP") issued a public statement on March 4, 2017 that separation would cause children trauma, and noted that "[p]roposals to separate children from their families . . . to deter immigration are harsh and

counterproductive," and "urge[d] policymakers to always be mindful that these are vulnerable, scared children."  On May 8, 2018, AAP issued a second public statement reiterating its position and noting that family separation "can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health."

132.    On April 5, 2017, one month after his televised statements discussed above, Kelly appeared to backtrack, at least in testimony to Congress.  When asked if he was considering separating children from their parents, Kelly testified before Congress that he would not routinely separate children from their parents and would allow such separations *only if the life of the child was in danger*.  He testified that he could not imagine separating children from their parents otherwise.

**B.    July Through October 2017:  Defendants Push Forward a Pilot Program to Separate Families from Central America.**

133.    Despite Kelly's public denials to Congress, in July 2017, a number of Defendants began a covert "pilot program" to test family separations at particular CBP facilities along the southern border.

134.    Upon information and belief, Defendants Kelly, Miller, Nielsen, Hamilton, McAleenan (then Commissioner of CBP), and Provost (Chief of CBP) conspired among themselves and with others to separate families pursuant to this pilot program.  These 2017 separations were then executed under McAleenan's and Provost's direct supervision.

135.    Upon information and belief, Defendant Lloyd, then Director of ORR, also actively participated in the conspiracy by helping to plan the separations.

136.    Yet, on multiple occasions between February 2017 and April 2018, when Commander White expressed concerns that separating families would cause children severe trauma, Defendants Lloyd and Wynne (who was, at that time, the HHS Secretary's Counselor for Human Services) falsely informed Commander White that ORR need not

plan for increased numbers of separated children because the U.S. government was not separating families.

137.    Despite these false denials, hundreds of children were separated from their parents during this pilot program in 2017.

138.    Under the pilot program, sometime after the children and parents were separated, the children were transferred from CBP to ORR custody.  When the children arrived at ORR-contracted facilities, those responsible for their care were not informed about the separations generally, or that these children had been separated.  Case workers and attorneys representing the separated children (especially the very young children) were not told that the children arrived in the United States with parents, did not know that the separated parents were being detained in the United States, and had no way to identify where and who those parents were.

139.    Although the pilot program was largely invisible to the public, immigrants' rights advocates began to piece together that families must have been forcibly separated in large numbers at border detention facilities.  They did so based on the changing demographics and numbers of children flooding into ORR shelters and foster care.  These shelters were accustomed to housing fairly consistent numbers of unaccompanied children in the 14-to-18-year-old range, because those children are more likely to have traveled on their own.  But, suddenly, they saw a sharp spike in the number of children entering ORR care, and the children they were now seeing were much younger, even babies and toddlers.  These children could not have attempted to travel on their own.  In addition, they appeared disoriented and traumatized.

140.    Based on what they were seeing, in December 2017, organizations including the Florence Immigrant & Refugee Rights Project, which is headquartered in Arizona, filed a complaint with DHS.  The groups explained that illegal family separations must have been occurring at the southern border in significant numbers in 2017, and they urged DHS

to investigate and stop the practice of separating families for purposes of punishment and excluding immigrants from Central America.  Among other things, the groups argued that "the practice of dividing family units at the border leads to the unlawful result of depriving asylum seekers of access to the asylum process"; was "so fundamentally unconscionable it defies countless international and domestic laws on child welfare, human rights and refugees"; violated the standards and mandate of CBP and ORR; and caused "[severe] trauma" to the separated families.

### C. December 2017:  The Family Separation Memo.

141. Upon information and belief, at or around the conclusion of the pilot program in October 2017, John/Jane Doe DHS Defendants encouraged Defendant Nielsen to separate all Central American families at all CBP facilities along the southern border. Upon information and belief, Nielsen discussed that potential with one or more of Defendants Kelly, Sessions, and Miller.  Upon information and belief, neither DHS nor any other government agency conducted any study of the medical or psychological effect the separations were having on the separated children or parents.

142. In December 2017, a number of Defendants collaborated in drafting a secret internal memorandum (the "December 2017 Family Separation Memo"), which described a plan to effect widespread family separations along the southern border, including in Arizona.  Upon information and belief, the December 2017 Family Separation Memo was created at the direction and under the supervision of Defendants McAleenan, Cissna, Homan, Nielsen, and Kelly.  Defendant Hamilton provided comments on the draft, which has since become public.

143. The December 2017 Family Separation Memo describes options for achieving Defendants' goal of excluding Central American immigrants from entering the United States at the southern border, including by separating immigrant families.  The

Memo contemplated that parents and children would be put in the custody of different federal agencies so they could be kept in different facilities.

144.    In one of his comments on the December 2017 Family Separation Memo, Defendant Hamilton noted the need for sufficient media coverage of family separations in order to send a message to other would-be immigrants.

**D.    January 2018 Through May 2018:  Family Separations Build.**

145.    Following the December 2017 Family Separation Memo, Defendants conspired to expand forcible separations of children and parents all along the southern border, and did so in the face of growing public opposition to the separations and their effects on children.

146.    During a Cabinet meeting at the White House in early 2018, Defendant Sessions told President Trump that, in response to the influx of asylum seekers from Central America, Defendant Nielsen needed to stop letting people from Central America into the country.

147.    On January 23, 2018, Defendant Nielsen received a letter from the Children's Defense Fund, on behalf of more than 200 organizations with recognized expertise in the fields of child welfare, juvenile justice, and child health, development, and safety.  The letter implored Nielsen to "reverse course" given that increasing family separations "will have significant and long-lasting consequences for the safety, health, development, and well-being of children."

148.    The separations also started to be challenged in federal court as unconstitutional.   On February 26, 2018, Defendants Homan, Nielsen, Sessions, McAleenan, Cissna, Azar, and Lloyd were named defendants in their official capacity in a class action habeas petition, which became known as the *Ms. L.* litigation.  *See Ms. L.* v. *ICE*, No. 18 Civ. 428 (S.D. Cal. Feb. 26, 2018).  Still, Defendants pressed ahead.

149.   On April 23, 2018, Defendants Homan, Cissna, and McAleenan co-authored a memorandum to Defendant Nielsen seeking further approval for expanded family separations along the southern border (the "2018 Family Separation Memo").

150.   Upon information and belief, Defendant Provost consulted with and advised Defendant McAleenan regarding the 2018 Family Separation Memo, which was sent to Defendant Nielsen.

151.   Shortly after Defendant Nielsen received the 2018 Family Separation Memo, she met with Defendants McAleenan, Homan, and Cissna in the Ronald Reagan Building in Washington, D.C. to discuss expanding family separations.  At that meeting, Nielsen agreed with McAleenan, Homan, and Cissna to pursue separation of families entering the United States at all points across the southern border.

152.   Upon information and belief, senior officials from the White House, DOJ, DHS, and HHS, including Defendants Sessions, Nielsen, Kelly, Miller, Hamilton, Homan, Vitiello, Cissna, McAleenan, Lloyd, and Provost, as well as John/Jane Doe DHS Defendants at CBP and ICE and John/Jane Doe HHS/ORR Defendants (collectively, the "Conspiracy Defendants"), discussed family separations in multiple meetings.  They also drafted, reviewed, and edited memoranda that spelled out how to deter immigrants by separating families at the southern border, despite warning as to the traumas that separated families would experience.  They repeatedly and deliberately ignored warnings from, among others, Commander White and public interest groups that separating families would violate civil and constitutional rights and cause both children and parents physical and psychological harm.

153.   Through these meetings and other directives in early 2018, Defendants Sessions, Kelly, Nielsen, Hamilton, Miller, Homan, Cissna, and McAleenan directed John/Jane Doe DHS Defendants at CBP and ICE to separate families at the southern border,

including in Arizona; and John/Jane Doe DHS Defendants at CBP and ICE knowingly and voluntarily did so.

154.    Upon information and belief, the Conspiracy Defendants conducted their discussions in secret, without consulting career technical experts in the government in order to avoid interference from those who did not share their objectives.  Upon information and belief, Conspiracy Defendants excluded individuals with technical expertise because they knew that widespread family separations were illegal and inhumane.

**E.    "Zero Tolerance" and Other Practices to Separate Families.**

155.    Defendants employed a number of practices to separate families.

156.    In some cases, Defendants offered no reason or justification for the separation.

157.    At other times, when a family presented themselves legally at a port of entry to apply for asylum, Defendants would claim that they were unsure that the adult traveling with the child was truly the parent and then separate the child, without taking any steps to verify parentage.

158.    Defendants also used the tactic of criminally prosecuting the parents for crossing illegally, even if they were seeking asylum.  Specifically, on April 6, 2018, Defendant Sessions publicly announced a "Zero Tolerance" directive to all U.S. Attorneys along the southern border, including in Arizona, to prosecute anyone who committed the misdemeanor of unlawful entry or re-entry under 8 U.S.C. § 1325(a).  Previously, asylum seekers, especially families, had not been systematically referred for prosecution for the misdemeanor of crossing the border illegally.  Over the last 20 years, less than one-third of apprehensions by CBP have resulted in criminal prosecutions, and any sentences imposed tended to be short, ranging from two to 15 days.

159.    In other cases, Defendants did not even claim a pretext for the separation.

160.    The "Zero Tolerance" announcement was conceived of, upon information and belief, by Defendants Sessions, Nielsen, Miller, and Hamilton, and was just a pretext or cover for the goal of furthering the widespread separations of Central American parents and children along the southern border.  Indeed, Defendant Nielsen later admitted under oath before the House Homeland Security Committee that she had discussed imposing widespread family separations with Sessions *prior to* the "Zero Tolerance" announcement.

161.    After the "Zero Tolerance" announcement, a parent would be prosecuted, but usually receive a sentence of time served that amounted to approximately 48 hours or less in jail, after which the parent would be returned to immigration custody.  During the brief time the parent was incarcerated, the child would be taken away, often flown across the country, and not returned to the parent even after the parent was returned to ICE custody.  In fact, one border patrol agent noted that it was possible that a parent could go to court and come back to the detention center *the very same day*, only to find his or her child already missing, either moved to another CBP facility or transferred to ORR custody.  In some cases, parents were purposely transferred to ICE custody after the prosecution in order to ensure that they were separated from their children—who remained in CBP custody for some period after the separation occurred.

162.    Defendants further claimed that when a parent was prosecuted, they had no choice but to separate the child because the child could not be housed in the jail.  But Defendants have never explained why they did not reunite the children once the parent had been returned to ICE custody after the brief period in criminal custody.  Children could have and should have been immediately reunified with their parents, and Defendants had no justification for failing to do so.  Nevertheless, rather than being separated from their parents for approximately 48 hours, children often spent sufficiently more time separated from their parents.

163.    There was no justification for Defendants' refusal to reunite families after the initial separations.    Some families remained forcibly separated for many months or even a year or more.    For extended periods, children and parents did not know what happened to each other and could not communicate.

164.    While defendants claimed that "Zero Tolerance" was evenhanded and designed to prosecute anyone who crossed the border illegally, whether a single adult or a family seeking asylum, in fact, "Zero Tolerance" was not an evenhanded practice.    It is now clear from recently released internal government memoranda that the government prioritized the criminal prosecution of parents precisely to achieve the separations of Central American families and inflict cruelty.

III.    **MAY 2018 THROUGH JULY 2018:**
**THE FAMILY SEPARATION CRISIS EXPLODES.**

165.    On the ground in Arizona and elsewhere, following Defendant Nielsen's evident approval of the 2018 Family Separation Memo, the government began to separate parents and children at substantially increased rates and in substantially increased numbers. Indeed, according to the House Oversight Staff Report, between May 7, 2018 and June 20, 2018—a period of just six weeks—*at least 2,231 children* were separated from their parents along the southern border.

166.    These separations, like the earlier ones, were effected in a brutal manner by John/Jane Doe DHS Defendants.    Many children were forcibly taken from their parents' arms over the pleas of both parent and child.    The government separated children with known medical conditions or disabilities from their parents without bothering to obtain critical medical information.    Parents were routinely lied to and deceived.    They were told their children were being taken for a bath, or that the separation would last a few hours, only to have the children never return.    Other parents were told that the separations would be indefinite or that they would never see their children again.    And all parents were left

wondering for hours, days, weeks, and even months as to where their children were, how they were doing, who was caring for them, when they could talk to them, and when they could be reunited.

167.    The White House Defendants, DOJ Defendants, DHS Defendants, and others concealed the fact that they were directing CBP and ICE officials to forcibly separate even those families who lawfully presented at a port of entry and committed no crime, or were *never* charged with a crime or spent any time in prison.  This was what happened to Plaintiff Lorena and to many other Class Members who presented themselves at ports of entry and were never prosecuted because they had committed no crime.

## A.    Defendants Subjected Families to Punitive Conditions of Confinement.

168.    By separating parents and children, keeping families apart, and restricting (and even eliminating) their communication during the period of separation, the White House, DHS, and HHS/ORR Defendants deliberately imposed, and were deliberately indifferent to, punitive conditions of confinement on Plaintiffs and Class Members.  The already punitive and traumatic separation experience was made worse by the lack of communication and generally inhumane conditions of confinement to which the families were subjected, both before and after separation.

169.    While in custody, parents and children were subjected to ethnic slurs by John/Jane Doe DHS Defendants.  For example, as noted above, guards mocked Plaintiff Ana, calling her a "dirty Guatemalan."  Parents and children also endured mockery and verbal abuse.  Audio recording leaked from a detention facility in June 2018 revealed the wailing of recently separated children between the ages of four and ten.  John/Jane Doe DHS Defendants could be heard laughing, and one joked:  "Well, we have an orchestra here—what's missing is a conductor."  This type of harassment and cruelty was permitted, and not checked by the corrective polices, training protocols, supervision, or discipline that DHS Defendants should have put in place.  DHS Defendants failed to craft a reasonable

response because allowing this harassment and cruelty advanced their intent to punish those in their custody.

170.    After being separated from their parents, children were transported to ORR-contracted facilities across the country, some thousands of miles from their parents.  They were put in cars, vans, buses, and airplanes—often their first time on a plane—without explanation as to where they were going, what would happen to them at their unknown destination, and when they would see their parents.  Upon information and belief, DHS Defendants intentionally withheld this information, and HHS/ORR Defendants instructed those within their chain of command to withhold this information.

171.    The experience of being in ORR custody was devastating for separated children.  Lawyers representing separated children recall that, when entering ORR shelters, the sound of crying was often overwhelming.  Other children were so traumatized that they could not even speak.

172.    While any amount of forced separation from their parents would have been traumatic, the detention of these children was made worse by the prolonged length of the separations.  While in prior years ORR typically held unaccompanied children for just over one month (the time it took to find a sponsor), the July 2019 House Oversight Staff Report found that separated children (who had parents in the United States) were detained for an average of approximately three months.  About three percent of those children were separated for more than six months, and some children did not see their parents for much longer.  Notably, these statistics underestimate the length of time that children and their parents were actually separated because they account for only the length of time a child was in ORR custody and do not account for time that children were in the custody of a sponsor who was not their parent.  Without access to the data that Defendants should have maintained, the true length of average separations can be only estimated.

173.    During the prolonged separations, children were prevented from talking with their parents for weeks or months, which also heightened the trauma.  This was avoidable.  DHS and HHS/ORR Defendants knew that thousands of families would be separated.  Yet, DHS and HHS/ORR Defendants failed to develop and implement any process through which families could communicate with one another.  The September 2019 HHS OIG Report concluded that this lack of communication during the period of separation "contributed to children's anxiety and fear for their parents' well-being."

174.    For many children, communication came only after their non-government case workers or lawyers identified and tracked down their parents.

175.    Once family connections were established, many DHS and HHS/ORR Defendants neither directed staff to facilitate communication between parents and children nor provided training in how to facilitate such communication.  The *Ms. L.* court identified deficiencies and ordered the government to facilitate communication between separated family members.  *Ms. L.*, 310 F. Supp. 3d at 1149–50.

176.    It was obvious to Defendants that these punitive conditions of confinement would further harm the separated families.  Yet they ordered, facilitated, and executed the separations anyway—all in furtherance of a goal to punish immigrants from Central America.

177.    Even those Defendants who did not act purposefully were deliberately indifferent to warnings from DHS and ORR career staff, internal reports circulated within ORR, CBP, ICE, and DHS,[4] letters from the American Academy of Pediatrics and other organizations, and formal complaints imploring Defendants to stop this humanitarian crisis of their own making.

---

[4]    Upon information and belief, there are internal reports at HHS, ORR, CBP, ICE, and/or DHS that will demonstrate that Defendants knew of the punitive conditions that were being imposed on Plaintiffs and Class Members.

**B.    Many Separated Parents Were Deported Without Their Children Due to Misrepresentations and Coercion by DHS Officials.**

178.    After the trauma of separations, hundreds of parents were coerced or misled by John/Jane Doe DHS Defendants to consent to their own removal.  These parents were not only unlawfully denied a meaningful opportunity to seek asylum or other appropriate immigration relief; they also experienced a far longer period of separation from their children.

179.    John/Jane Doe DHS Defendants lied to parents and told them that waiving their rights to asylum was the only way to be reunited with their children.  John/Jane Doe DHS Defendants also misrepresented to separated parents that they were ineligible for asylum or that pursuing an asylum case would extend the separation from their children.

180.    Some parents were tricked into consenting to their own deportation by being told that the removal document—which they could not understand because it was in English with no Spanish or other translation—was necessary for their asylum case.  Absent the coercion and the trauma of separation, most of these deported parents would not have abandoned their rights to seek asylum in the United States.

181.    Other separated parents signed removal papers they could not understand because of the confusion, trauma, or sense of futility that they felt as a result of the separation.  The horror of the separation experience caused these parents simply to give up because they did not think they would ever be reunited with their children in the United States.

182.    The actions by John/Jane Doe DHS Defendants to coerce parents into waving their rights were flagrant violations of Plaintiffs' legal rights.  Many parents were separated from their children for much longer than they otherwise would have been because they were coerced into agreeing to their own deportation.  Others were wrongfully deprived of an opportunity to remain in this country permanently when John/Jane Doe DHS

Defendants coerced them into waiving their asylum claims.  For those Class Members, the consequence was to return to countries where they face violence or persecution.

183.    Hundreds of parents, including Plaintiffs Lorena, Jairo, and Jacinto, were deported without their children.  Their children were stranded in the United States, thousands of miles away from their parents, with little or no ability to communicate with their parents or other family members.  And some parents were deported even after the injunction in the *Ms. L.* litigation went into effect that supposedly halted such deportations.

184.    In the *Ms. L.* litigation, the court recently granted requests by 11 parents deported without their children to be returned to the United States.  *Ms. L.* v. *ICE*, No. 18 Civ. 428, ECF No. 456 (S.D. Cal. Sept. 4, 2019).  As to six of those parents, the court found that various factors made it such that their decisions to withdraw asylum claims and agree to removal were not the product of free and deliberate choice.  In particular, the court found that factors such as prolonged separation from and lack of communication with their children undermined the voluntary nature of the parents' decisions.  The court also found that, at least in some instances, government officials used heavy-handed coercive measures, including threatening a parent that if he did not withdraw his asylum claim, his child would be taken from him and put up for adoption.

## C.    DHS Defendants and HHS/ORR Defendants Failed to Prepare the System for the Separation Crisis.

185.    The explosion in the number of family separations and the influx of separated children—particularly tender age children—imposed new burdens on the ORR system. DHS Defendants and HHS/ORR Defendants failed to prepare or warn those who would be responsible for the care of separated children that a substantial number of young, traumatized children would be entering ORR custody.  As a result, ORR facilities and foster families failed to provide necessary medical, mental health, and other services to separated children, exacerbating their trauma.

186.    ORR is charged with administering the care of unaccompanied children and must provide a variety of services, including:  suitable living accommodations; food; appropriate routine medical and dental care; educational services appropriate to the minor's level of development; at least one individual counseling session per week and group sessions at least twice a week; and visitation and contact with family members.

187.    ORR, under the direction of the HHS/ORR Defendants, failed to prepare its facilities for a large influx of very young and highly traumatized children and, as a result, breached the duty to properly care for the children in ORR custody.

188.    ORR's UAC system was designed to care for the most common demographic:  unaccompanied boys between the ages of 12 and 17—with an average age of 15.  Children 12 and under are deemed of "tender age."  Historically, tender age unaccompanied children are less common because most young children enter the United States with a parent or guardian.

189.    Not surprisingly, tender age unaccompanied children require particularized care, including facilities that are specifically licensed to house young children.  When the family separation crisis began in 2017, there were only a limited number of facilities licensed to house tender age unaccompanied children.

190.    The more typical, older unaccompanied children are usually prepared when they arrive in the United States.  They often bring documents, like their birth certificates, and the names and contact information for family or friends in the United States.  They generally understand what will happen to them and can participate in decisions about planning for their release.

191.    By contrast, tender age separated children require a completely different approach to case management.  These young children typically are not prepared to be separated from their parents, cannot understand what is happening, and cannot provide

information about themselves or their parents.  Dozens of children separated in 2017 and 2018 were not even verbal, and many were still in diapers.

192.   Upon information and belief, all of the HHS/ORR Defendants received daily trend reports that identified, among other things, spikes in the number of children crossing the border and increased migration from a particular country.  The trends were typically analyzed each week to identify any need for changes in policies, practices, training, or shelter capacity.

193.   Upon information and belief, these trend analyses put the HHS/ORR Defendants on notice of the demographic changes associated with family separations, including an increase in the number of unaccompanied children.  The trend reports provided "storm warnings"—data-driven insight into the increasing number of family separations.  In addition, the ORR facilities were experiencing an increase in very young unaccompanied children.  The concerns repeatedly raised by Commander White amplified these storm warnings.

194.   A January 2019 report by the HHS Office of the Inspector General (the "January 2019 HHS OIG Report") concluded that ORR officials observed a steep increase in the number of separated children as early as the summer of 2017.  The January 2019 HHS OIG Report also found that, as early as November 2017, internal ORR emails recognized "that separated children were often very young, that these younger children required placement at specially licensed facilities, and that 'the numbers of these very young UAC[s] resulting from separations has on some dates resulted in shortfalls of available beds.'"

195.   Defendant Lloyd did not need the trend reports to be on notice of the need to prepare the UAC system for the unique challenges presented by widespread separations—because he was part of the conspiracy to execute them.

196.    The unusual increase in very young children placed insurmountable pressure on the UAC system and warranted significant changes to ORR practices if appropriate care were to be provided.  Yet HHS/ORR Defendants took no meaningful steps to pursue such changes.   For example, Defendant Lloyd and other HHS/ORR Defendants either deliberately, or knowingly and recklessly, failed to engage emergency planning teams to plan for or respond to the changes in the demographics of unaccompanied children—even though HHS generally, and ORR specifically, have designated staff with emergency planning responsibilities and expertise.

197.    Moreover, the HHS/ORR Defendants failed to provide warnings to the facilities responsible for the daily care of unaccompanied children—leaving shelter staff unaware that children had been forcibly separated from their parents and ensuring that shelters would be ill-prepared for the challenges of the separation crisis.

198.    Shelter staff and children's advocates who saw changes in the demographics of the "unaccompanied" children in 2017 and early 2018 did not initially understand what was happening or the reasons for the changes.  It took time to figure out that a child now in ORR custody had not arrived "unaccompanied" but had been separated from his or her parent at the border and that the parent was likely elsewhere in the United States.

199.    At the same time that HHS/ORR Defendants failed to inform facilities that many children in their care had been forcibly separated from their parents, in June 2018, ORR changed its sponsor screening requirements, leading to significant delays in releasing children to sponsors, including their parents.  As the September 2019 HHS OIG Report explains, "ORR revised its sponsor screening requirements and began mandating fingerprint-based FBI criminal history checks of all potential sponsors, including parents, and all adult members of their households.  Further, these fingerprints were shared with ICE and could be used for immigration enforcement purposes."

200.   As a result of both the confusion about the children's "unaccompanied" status and the new screening requirements, separated children remained in ORR custody three times longer than typical unaccompanied children, as described *supra*.  According to the September 2019 HHS OIG Report, "[f]acilities reported that children with longer stays experienced more stress, anxiety, and behavioral issues, which staff had to manage," and even children "who did not initially exhibit mental health or behavioral issues began reacting negatively as their stays grew longer."

201.   The resulting chaos expanded as the number of separated children increased. At some point, available bed space for tender age children was exceeded.  In spring 2018, HHS/ORR Defendants, including Lloyd, rushed to license more Arizona facilities to house the growing number of tender age children.  Only two Arizona facilities had previously been licensed for tender age children, but with a large influx of young children, more bed space was urgently needed.  All 13 Southwest Key facilities in Arizona were quickly licensed to care for tender age children.  Upon information and belief, none of these facilities were adequately warned about the separations or how the children would be affected.

202.   As a result of the rushed licensing and HHS/ORR Defendants' failure to advise, shelters had inadequate resources with which to care for the youngest children. Among other things, shelters lacked sufficient diapers, wipes, changing tables, cribs, and staff to care for young children who were not yet mobile.  Children were provided with insufficient education and recreation opportunities.  In general, the shelters were grossly under-resourced and understaffed.

203.   When ORR lacked adequate bed space to house the youngest separated children, foster families were hastily recruited.  Existing foster families who fostered one or two children were asked to foster three, four, or even five children to accommodate the increasing number of separated children.  Upon information and belief, the foster families

were not told that the children had been separated from their parents.  Separated children experienced greater conflict within foster placements than is typical because families were ill-prepared to care for so many traumatized young children, and there were often too many children in each home.

204.    DHS and HHS/ORR Defendants failed to collect children's medical histories before taking them from their parents.  While some medical conditions were visible, other conditions and full medical histories could have been gathered only from the parents— including for conditions like anxiety or depression or food allergies.  That was especially true for the younger children, who could not be expected to explain their medical histories or health care needs.  Indeed, many children were pre-verbal.  As a result, some children were deprived of necessary care.

205.    Even those DHS and HHS/ORR Defendants who did not intentionally forgo the collection of medical information nonetheless ordered, facilitated, and executed separations with deliberate indifference to the importance of children's medical histories. That indifference was evidenced, in part, by DHS and HHS/ORR Defendants' failure to develop any plan, policies, guidance, or training to ensure that children's basic medical histories would be collected before or soon after the separations and recorded.

206.    Defendant Lloyd later admitted to Congress that he and other HHS/ORR Defendants knew children would suffer mental health consequences from the separation experience.  Yet these Defendants failed to prepare the UAC system for the arrival of so many uniquely traumatized children.  The HHS/ORR Defendants did not adequately warn shelters about the separations and failed to adopt policies or practices, or provide training, to ensure that separated children would be properly treated for their extreme and ongoing trauma.

207.    The September 2019 HHS OIG Report described how children who did not understand why they had been separated from their parents "suffered elevated levels of

mental distress" and recounted the experience of one young boy who, without any explanation for why he had been separated from his father, "was under the delusion" that his father had been killed and believed that he would be killed as well. The child ultimately required emergency psychiatric care.

208. Defendants' failure to warn the shelters regarding the ever-increasing numbers of separated children entering ORR custody meant that there were too few case workers available to take children to medical and mental health appointments, even in cases where children needed specialized care with outside providers.

209. In the cases where health care was provided to separated children, that care was often provided without the consent of or consultation with the children's parents because medical providers did not know how to contact the parents. For example, some separated children were institutionalized and/or prescribed medications without their parents' consent or knowledge. Attorneys appointed to represent the children were shocked that commitment proceedings went forward without parental involvement, which is required in the ordinary course.

210. The HHS/ORR Defendants also made no plans, provided no training, and issued no warning to shelter staff or foster families that additional translation resources would be needed. This occurred despite trend reports that showed a sharp increase in children from Guatemala—where many people speak exclusively indigenous languages. For these children, the inability to communicate or understand what was happening intensified their trauma. Some children, including Plaintiff Beatriz, learned English or Spanish and lost fluency in—or even the ability to speak and understand—their native language. These children lost not only their connection to their culture; some lost the ability to meaningfully communicate with their parents once reunified.

211.    Each of the failures of the DHS Defendants and the HHS/ORR Defendants detailed above intensified the damage that children experienced from the separation from their parents.

**D.    June 2018:  Family Separations Prompted Widespread Public Outcry.**

212.    The substantial increase in separated families drew national attention and widespread public condemnation.  In May 2018, the American Academy of Pediatrics issued a statement rebuking the "sweeping cruelty" of family separation.  The United Nations Office of the High Commissioner for Human Rights described family separation as an "arbitrary and unlawful interference in family life" and "a serious violation of the rights of the child."  Religious leaders and organizations from numerous faith traditions— including Pope Francis, the United States Conference of Catholic Bishops, the Southern Baptist Convention, national Jewish organizations and institutions, the Quakers, and others—also condemned family separations.  Pope Francis denounced the family separations and supported recent statements by the United States Conference of Catholic Bishops that called family separations "immoral" and "contrary to our Catholic values."

213.    On June 17, 2018, former First Lady Laura Bush wrote an op-ed for the *Washington Post*, in which she called the ongoing family separations "cruel" and "immoral" and described recent published photos of separated children as "eerily reminiscent of the internment camps for U.S. citizens and noncitizens of Japanese descent during World War II, now considered to be one of the most shameful episodes in U.S. history."

214.    On June 18, 2018, ProPublica released audio it had obtained from inside a CBP facility that recorded ten Central American children, who had recently been separated from their parents at the southern border, sobbing and desperately pleading for their mothers and fathers.

215.   Meanwhile, while the pleas of the separated children for their parents were ringing in the nation's ears, members of the Trump Administration minimized families' suffering or denied that separations were happening.  For example, Defendant Kelly stated in a May 11, 2018 NPR interview that family separation "could be a tough deterrent" and dismissed humanitarian concerns, stating that "[t]he children will be taken care of—put into foster care or whatever."  Similarly, in a June 21, 2018 Fox News interview, Defendant Sessions admitted that the government was separating families, adding, "hopefully people will get the message and come through the border at the port of entry and not break across the border unlawfully."  He did not acknowledge that many families were separated *even though* they came through official ports of entry.

216.   Meanwhile, on May 15, 2018, Defendant Nielsen testified before the Senate Homeland Security and Governmental Affairs Committee:  "We do not have a policy to separate children from their parents."  She repeated this assertion on Twitter a month later: "We do not have a policy of separating families at the border.  Period."  And in a press conference at the White House on June 18, 2018, despite having approved memoranda directing family separations, Defendant Nielsen called any claim that she intended for parents to be separated from their children at the border "offensive."

217.   Just two days after Defendant Nielsen's press conference, on June 20, 2018, the Trump Administration bowed to public pressure and issued an Executive Order that purported to end family separations at the southern border.

218.   The Executive Order, however, did nothing to reunify the thousands of parents and children the government had already cruelly separated.  Those reunifications came only after the federal judge in the *Ms. L.* litigation ordered the government to reunite separated families and closed loopholes in the Executive Order.

### E.   July 2018:  Family Separations Enjoined.

219.   On July 26, 2018, the federal court in the *Ms. L.* case issued a nationwide preliminary injunction prohibiting the government from continuing to keep families separated absent a determination that a parent is unfit or presents a danger to his or her child.  The court's order required that the defendants reunify all class members with their children within 30 days, and that children under five years old be reunified within 14 days. *Ms. L.* v. *ICE*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018).

220.   The injunction was based on findings that the government had separated parents from their children, and failed to reunite separated families, without a determination that the parent was unfit or presented a danger to the child and that the government's conduct shocked the conscience.  *Id.* at 1142.  In some cases, parents who had been separated from their children had lawfully presented themselves at ports of entry and had not been charged with any crime or placed in criminal custody.  *Id.* at 1139, 1143.  Indeed, the court determined that the government's actions had "resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally." *Id.* at 1143.

221.   The *Ms. L.* court further noted that, as evidenced by the United States' codification of principles of asylum, it was the intent of U.S. law "to treat refugees with an ordered process, and benevolence," yet the government's treatment of the *Ms. L.* class failed to meet that standard or pass constitutional muster.  *Id.* at 1144.

222.   Furthermore, the *Ms. L.* court credited scientific and medical evidence that separations caused irreparable harm and that "separating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development."  *Id.* at 1147.

223.   The court found that the government "has an affirmative obligation to track and promptly reunify these family members."  *Id.* at 1145.  Yet, the court noted, the

"government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*." *Id*. at 1144.

224.    By December 12, 2018, ORR identified more than 2,800 children believed to have been separated from their parents, under the *Ms. L.* class definition. As of September 11, 2019, subsequent disclosures in the *Ms. L.* litigation have identified an additional 986 distinct separated children, and have indicated that there may be as many as approximately 2,000 more separated children whom the government has not yet identified by name to the court.

**F.    July 2018 to the Present:  Family Separations Continue Despite Injunction.**

225.    Despite the *Ms. L.* court's injunction and its unequivocal indictment of family separations, families remain unlawfully separated. Separations that occurred before the *Ms. L.* injunction were prolonged, in part, because the separations Defendants ordered were not recorded anywhere, and so no one in the government could identify which child belonged to which parent to effect timely reunifications. In addition, notwithstanding the *Ms. L.* injunction, the government has continued to this day to separate large numbers of families along the southern border.

**1.    Defendants' Failure to Track Family Relationships Has Prolonged Separations and Prevented Communication.**

226.    In the ordinary course, DHS and HHS data systems record the familial connections of parents and children entering the country together.

227.    After the separations, however, children were deliberately re-categorized as unaccompanied children, indicating that they did not arrive at the border with a parent or guardian. As a result, family relationships were excluded entirely from separated parents' and children's records. DHS and HHS essentially erased their forcible separations from

1  the data.  DHS Defendants nonetheless falsely and publicly insisted that DHS had an

2  adequate tracking system for the separated families.  Defendants McAleenan and Provost

3  later conceded in Congressional testimony that there was no central database to match

4  separated children to their parents.

5      228.  The *Ms. L.* court concluded that children had been separated without any

6  effective system for tracking the family relationship. 310 F. Supp. 3d at 1144.  As the court

7  stated, "what was lost in the process was the family.  The parents didn't know where the

8  children were, and the children didn't know where the parents were.  And the government

9  didn't know, either."

10     229.  The court described the "startling reality" that "the government readily keeps

11  track of personal property of detainees," which is "routinely catalogued, stored, tracked

12  and produced upon a detainees' release. . . . Yet, the government has no system in place to

13  keep track of, provide effective communication with, and promptly produce alien

14  children."  An October 2018 Government Accountability Office report stated that both

15  DHS and HHS were responsible for the inability to identify which child belonged with

16  which parent.

17     230.  Because separated parents could not be identified or located, there was no

18  way to easily provide children with information about their parents.  Likewise, there was

19  no way for parents to be provided with information about their children's whereabouts or

20  well-being.  There also was no way for parents and children to talk to each other.

21     231.  ORR is obligated to ensure the expeditious release of unaccompanied

22  children, yet separated children whom the U.S. government had reclassified as "UACs"

23  could not be reunified with parents no one could identify or find.  The House Oversight

24  Staff Report concluded that the stripping of data connecting parents to their children thus

25  "caused lengthy delays to reunification."  Even after parents were finally identified and

26  located, the erasure of the familial relationship in the government databases prolonged the

1    separations. Because they had no clear record of which child belonged to which parent,

2    DHS and HHS/ORR Defendants made parents take DNA tests to *prove* parentage and

3    required them to apply to reclaim their children—as if they were a non-parent seeking to

4    become a sponsor.

5    232. More than a year after the separated families were ordered reunified, DHS

6    and HHS/ORR Defendants still have not identified all of the separated families. The House

7    Oversight Staff Report found that the failure to track the familial relationships had, in some

8    cases, caused "separations that are still ongoing today."

9    233. The family separations were ordered, facilitated, and executed by Defendants

10   who knew that the link between separated parents and their children would be stripped

11   when the children were reclassified as "UACs" or who demonstrated callous indifference

12   by recklessly ignoring that fact. Career DHS employees were aware that poor data sharing

13   was an issue. Upon information and belief, Defendants Kelly, Nielsen, McAleenan,

14   Cissna, Homan, Provost, Azar, and Lloyd were aware of these failures, but ignored them.

### 2.    Family Separations Continue.

16   234. Even to this day, the government is continuing to unlawfully separate

17   families entering at the southern border, notwithstanding the injunction in the *Ms. L.* case.

18   As of September 2019, approximately 1,000 children had been separated following the

19   injunction, many on questionable or pretextual grounds. Of these known post-injunction

20   separations, at least 185 were of children under the age of five.

21   235. For example, the government has separated many of these children based on

22   their parents' minor, and in many cases old, offenses. One parent had his child taken

23   because he had a prior conviction for malicious destruction of property valued at $500.

24   Another parent was separated based on a 27-year-old conviction for drug possession.

25   Many others were separated based on traffic offenses, DUIs, minor property crimes, and

26   possession of marijuana.

236.    The government has invoked other pretextual bases on which to separate families as well, including unjustified doubts as to the validity of familial relationships. For example, one father had his three-year-old daughter taken from him because his name was not listed on her birth certificate even though he presented other documentation proving his parentage.  Eventually, with the assistance of counsel, that father took a DNA test demonstrating that he was his daughter's biological father, but only after his young daughter had been sexually abused while separated and in ORR custody.

237.    Other families have been separated based on parents' health issues that present no serious risks to the children, including where a parent is HIV positive.  Brian Hastings, the chief law enforcement officer at CBP, testified before the House Judiciary Committee that a child had been separated based on his or her parent's HIV status, despite the fact that doing so contradicts nearly decade-old USCIS policy.

238.    The House Oversight Staff Report has concluded that "[h]undreds of additional children have been separated from their parents" since June 2018 and that "[t]hese continued unnecessary separations have contributed to the current crisis of children suffering in overcrowded, poorly run government detention facilities at the border."

239.    In the face of public and legal rebuke, and despite their prior denials, the Trump Administration now admits that the government was all along separating families in order to deter immigration by Central Americans via the southern border.  Responding to questions on the South Lawn of the White House on October 13, 2018, President Trump said, "If they feel there will be separation, they don't come."  A few months later, President Trump tweeted, "[I]f you don't separate, FAR more people will come."  Later, in March 2019, the President went even further in a private conversation with Defendant McAleenan, urging him to block asylum seekers from entering the country and telling McAleenan that he would pardon him if McAleenan went to prison for so doing.

## IV.    DEFENDANTS TARGETED CENTRAL AMERICANS BECAUSE OF THEIR RACE, ETHNICITY, AND/OR NATIONAL ORIGIN.

240.    The Conspiracy Defendants and others acting in concert with them have made numerous public statements acknowledging that they discriminated against Central Americans based on their race, ethnicity, and/or national origin and that family separations were intended to deter immigration by Central Americans.  They specifically targeted the southern border, the entry point into the United States for most Central American immigrants, while, upon information and belief, immigrant families who arrived at the northern U.S. border or at other ports of entry on the coasts or at airports were not targeted for separation.  And it was Central Americans who were overwhelmingly affected by Defendants' unlawful conduct:  More than 95 percent of the separated families identified as *Ms. L.* class members are from Central America.

241.    Conspiracy Defendants' discriminatory animus toward immigrants from Central America is no secret.

242.    After his election, President Trump and members of his soon-to-be administration, including Defendants Kelly, Miller, and Sessions, immediately began planning ways to exclude immigrants from countries that they considered undesirable.  In developing many of its immigration strategies, the administration appears to have been inspired by a 79-item list of "immigration actions the next president can take" prepared in April 2016 by the Center for Immigration Studies ("CIS").  Both Sessions and Miller have longstanding ties to CIS.  They have appeared at CIS conferences and events and repeatedly referenced and relied on CIS's work.

243.    Many of the proposals on the CIS list are geared toward stopping what it calls the "surge of arrivals on our southern border."  Among other things, the CIS list advocated the detention of asylum seekers; a prohibition on the release of unaccompanied minors to their undocumented relatives living in the United States unless those relatives surrendered themselves to authorities for immigration processing and court proceedings; required DNA

testing to confirm familial relationships before releasing unaccompanied minors to family members; selective prosecution of family members who pay to "smuggle" unaccompanied minors into the United States; and the expansion of the expedited removals program. The administration has used many, if not all, of these tactics in connection with immigration enforcement efforts, including family separation. In a January 2019 article evaluating the degree to which President Trump had achieved the items on its anti-immigration wish-list, CIS clearly stated that certain of its recommendations were specifically targeted at Central Americans, including its recommendations for restricting the ability of individuals entering at the southern border to claim asylum.

244. President Trump has spoken openly about his animus towards certain immigrants, including those from El Salvador, which, in January 2018, he included in a list of "shithole countries." By contrast, he has stated that the United States should instead favor immigrants from countries like predominantly white Norway. Promoting immigration from Europe has been a consistent theme of the President's immigration rhetoric. In a 2013 speech to the Conservative Political Action Conference, Trump asked, "why aren't we letting people in from Europe?"

245. President Trump has made clear that he believes Central American immigrants are an undesirable group, complaining that people who do not share his views of this population "don't care about crime and want illegal immigrants, no matter how bad they may be, to pour into and infest our Country." During a Cabinet meeting, while discussing family separation, President Trump suggested that immigration by Central Americans would mean "our country will be overrun by people, by crime, by all of the things that we don't stand for—and that we don't want."

246. President Trump has frequently invoked the specter of gang membership to promote fear of Central American immigrants more broadly. For example, in his first State of the Union Address in January 2018, he falsely suggested that the notorious Central

American gang MS-13 was expanding in the United States as a result of laws intended to protect unaccompanied children entering the United States.  And, on multiple occasions, including at the Conservative Political Action Conference in February 2018 and during an immigration roundtable discussion in May 2018, President Trump has conflated all immigrants with gang members, whom he called "animals."

247.    After family separations were enjoined in July 2018, President Trump continued his discriminatory rhetoric against Central Americans.  In April 2019, he described Central Americans as physically threatening, gang members, and people who lie about their need for asylum:  "Some of the roughest people you've ever seen, people that look like they should be fighting for the [Ultimate Fighting Championship] . . . We don't love the fact that he's got tattoos on his face.  That's not a good sign.  *We don't love the fact that he's carrying the flag of Honduras or Guatemala or El Salvador*, only to say he's petrified to be in his country."  President Trump has repeatedly characterized immigrants as dangerous criminals who are "invading" and "infesting" the United States, calling a caravan of Central American asylum seekers an "invasion."

248.    Each of the Conspiracy Defendants was aware of President Trump's animus towards immigrants from Central America based on his public and private statements. They serve or served at the pleasure of the President, and in their roles, they have implemented the Administration's discriminatory agenda, including through initiatives and/or practices that disfavor non-white, non-European individuals generally and target Central Americans specifically.

249.    President Trump has expressed his animus toward Central Americans perhaps more bluntly and with more frequency than other members of his Administration. But, upon information and belief, the President's most senior advisors, including the Conspiracy Defendants, agreed with and shared President Trump's desire to deter immigration from Central America and/or took steps to facilitate governmental conduct

that they knew was based on a repeatedly and publicly proclaimed discriminatory animus against Central Americans.

250.    For example, Defendant Sessions has praised the Johnson-Reed Act, the 1924 immigration law designed to curtail immigration by allegedly inferior and undesirable groups—then Italians, Jews, and Asians—and has lamented the rising number of foreign-born individuals living in the United States, noting that the United States is on a path to "have the highest percentage of Americans, non-native born, since the founding of the Republic," which he deemed a "radical change."

251.    Defendant Kelly defended efforts to deter immigration by Central Americans by claiming that this group would not "assimilate" well into the United States: "They don't speak English; obviously, that's a big thing. . . . They don't integrate well; they don't have skills."

252.    Defendant Miller has a documented history of anti-immigrant beliefs.  Like Defendant Sessions, for whom he once served as a Senate aide, Miller has decried the rising number of immigrants in the United States and promoted immigration restrictions like those imposed by the U.S. government in the 1920s.  And, like President Trump, Miller has characterized immigrants who cross the southern border as dangerous criminals, claiming, without basis, that "thousands of Americans die year after year because of threats crossing our southern border."  A driving force in establishing family separation as a practice, Miller has continued to defend those separations even after the widespread public outcry.  He was reported to have been pleased to see the photographs of separated families that were published during the height of the crisis.

253.    The discriminatory animus toward Central American immigrants held by these top government officials was and is shared by officials at DHS and encouraged and emboldened lower-level DHS officials, including John/Jane Doe DHS Defendants, to act consistently with that animus.

254.     In their roles at CBP, Defendants McAleenan and Morgan have overseen an agency where bigotry is pervasive among CBP agents along the southern border, including John/Jane Doe DHS Defendants within CBP, and where agents have assaulted or killed immigrants at the border.  Ongoing litigation has, for example, revealed an environment at CBP in which demeaning epithets are common, and in which violence against immigrants at the southern border is treated as a joke.  The defendant in that case—a CBP agent in Arizona who rammed a truck into an unarmed Guatemalan man he suspected was an unauthorized border crosser, as the individual retreated across the border—represented in court filings that slurs and expressions of hatred were not isolated incidents, but regular *features* of the culture at CBP.

255.     A recently identified private Facebook page, with 9,500 members who are primarily current and former CBP agents, corroborates the rampant culture of bigotry and cruelty at CBP.  Members of the Facebook group, which existed during the separation crisis, joked about the deaths of migrants, discussed throwing burritos at Latino members of Congress, and circulated a vulgar illustration depicting Representative Alexandria Ocasio-Cortez, a Latina, performing oral sex on detainees.  It has been reported that Defendant Provost, the chief of CBP, was herself a member of that Facebook group.  Upon information and belief, the head of CBP was thus aware of the rampant bigotry within her agency and yet did nothing to address it.

256.     This culture of discriminatory animus was not limited to CBP.  Ian M. Smith, a former DHS analyst who was forced to resign after the press revealed his ties to neo-Nazis and white nationalist groups, allegedly attended multiple immigration policy meetings at the White House convened by Defendant Miller and worked on policy efforts at USCIS.

V.  SEPARATED FAMILIES WERE
     IRREVOCABLY AND IMMEASURABLY HARMED.

257.  Family separations severely traumatized children and their parents.

258.  In the case of very young children, such trauma can be permanent.  The president of the American Psychological Association has stated that family separation "is not only needless and cruel, it threatens the mental and physical health of both the children and their caregivers."  Research shows that "trauma caused by family separation threatens mental health as much as the atrocities families experience in the countries they are fleeing."  In fact, family separation is "on par with beating[s] and torture in terms of its relationship to mental health."

259.  A specialist in child health and development and pediatrics at Harvard, Dr. Jack P. Shonkoff, explained it this way:  "Forcibly separating children from their parents is like setting a house on fire.  Prolonging that separation is like preventing the first responders from doing their job and letting the fire continue to burn."

260.  Those who came into contact with the separated children in ORR custody observed the children's extreme suffering.  Some reported the sound of near-constant crying in shelters or, at times, an eerie silence reflecting the absence of ordinary childhood activity.

261.  Younger children displayed unusual attachment patterns, including clinging to case workers they had known for only a short period of time.  Some children became abnormally attached to foster parents or, particularly in the case of very young children, became confused about who were their actual parents.  Other children blamed their parents for the separation, believing that they had allowed it to happen.  This damaged children's emotional health and, in some cases, negatively affected children's relationships with their parents on a long-term or even permanent basis.

262.  A clinical psychologist in Phoenix who works with children in ORR custody has observed that many separated children "suffer from complex trauma, attachment

problems, depression, generalized anxiety and social anxiety."  Some of the adolescents she treats "still urinate in bed," and there are young children "exhibit[ing] self-harming behaviors, like cutting."  In a study of immigrant families, scientists "found that longer separations from parents during the immigration process led to higher rates of anxiety and depression," and a second study similarly found that separation placed children "at an increased risk for anxiety, depression, and substance abuse during adulthood."  More recent research showed that separated children "may also be at increased risk of post-traumatic stress disorder (PTSD)."

263.   The prolonged period of these separations intensified the children's trauma. Psychologists studying neurobehavioral development have found that subjecting young children to institutional environments such as those at issue here can create irreversible changes in the brain, which can lead to trouble with executive function tasks, working memory, inhibition control, and cognitive flexibility, and developmental delays in speech and fine motor skills.  Dr. Shonkoff explains that "when children are removed from their parents, and especially when placed in institutional settings, high and persistent levels of stress activation can disrupt the architecture of the developing brain and other biological systems with serious negative impacts on learning, behavior, and both physical and mental health."

264.   Even reunifications were sometimes painful for the separated families as a result of the severe trauma experienced.  Some separated children expressed anger or refused to engage.  Some very young children no longer recognized their parents.  Other children simply clung to their parents and sobbed.

265.   The children who have been reunited with their parents as of the date of this Complaint—including the children named here as Plaintiffs—were traumatized from their separation experiences.  Their symptoms include anxiety, anger, introversion, and regression.  Ana's son, Mateo, cries more frequently and cannot sleep or bathe alone; her

younger son, Jaime, has bouts of anger.  Lorena's daughter, Karina, suffered from preexisting depression—conditions that worsened during the extended and traumatic 16-month separation from her mother.  Jorge's daughter, Diana, has difficulty being apart from her father and is distrustful of strangers.  Jairo's daughter, Beatriz, is more prone to temper tantrums and felt uncomfortable around her parents when they were first reunited.  Jacinto's son, Andrés, is now more withdrawn and struggles when apart from his parents.

266.    The separated parents also experienced extreme trauma, and they too received little or no mental health care while detained.  At least one separated father died by suicide following the trauma of separation.  Parents who survived this experience face a heightened risk of depression, anxiety, and other mental health conditions.  The named Plaintiffs continue to struggle with trauma caused by the separation and their powerlessness to help their children.  They all experienced profound grief and desperation.  For some, the trauma has manifested in physical symptoms, including insomnia, nightmares, painful headaches and dizzy spells, and weight loss.

267.    Defendants caused thousands of families' profound suffering by ordering, facilitating, and/or executing these separations.

## VI.    CLASS ALLEGATIONS.

268.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(1) and 23(b)(3).

269.    Plaintiffs seek to represent two classes:  (1) a nationwide class consisting of all minor children who since 2017 have arrived at or between ports of entry along the United States' southern border, and who have been separated from their parents by DHS or its sub-agencies (including CBP, ICE, or USCIS) without a demonstration in a hearing that the parent was unfit or presented a danger to that child (the "Child Class"); and (2) a nationwide class consisting of all parents who since 2017 have arrived at or between ports of entry along the United States' southern border, and who have a minor child who was

separated from them by DHS or its sub-agencies (including CBP, ICE, or USCIS) without a demonstration in a hearing that the parent is unfit or presents a danger to the child (the "Parent Class") (the Child Class and Parent Class together, the "Classes").

270.   Plaintiffs are members of the Classes which they seek to represent.

271.   The Classes are so numerous that joinder of all members in each Class is impracticable.  The Classes consist of thousands of children and parents, respectively, since approximately 4,000 children have already been identified in the *Ms. L.* case as having been separated from their parents.  The total number of family separations during the relevant period is much higher.  The exact number of persons in each Class is unknown at this time, but can be ascertained through appropriate discovery.

272.   The names and identities of the members of each Class are ascertainable— many through records in the *Ms. L.* litigation and others from information and records in the possession or control of Defendants or the U.S. government.

273.   There are numerous questions of law and fact common to each of the Classes which predominate over any questions affecting only individual Class Members, and the wrongs suffered and remedies sought by Plaintiffs and the other members of each of the Classes are premised upon an unlawful pattern and practice by Defendants.  Each member of the Child Class and the Parent Class has been subjected to forcible unjustified separation without a hearing and suffered from Defendants' refusal to reunite the children with their parents for prolonged periods of time for no legitimate reason.  The common questions of law include, among other things, whether Defendants' forcible family separations and prolonged seizures violated Class Members' Fourth Amendment rights, their procedural and substantive due process rights, and their rights to equal protection under the Due Process Clause of the Fifth Amendment, and whether the Conspiracy Defendants conspired to deprive Class Members of equal protection of the laws.

274.    Plaintiffs' claims are typical of the claims of each of the Classes and are based on the same legal and factual theories.

275.    Plaintiffs will fairly and adequately represent the interests of the Classes. Plaintiffs have suffered injury from the practices complained of and are ready, willing, and able to serve as class representatives.

276.    Plaintiffs are represented by counsel experienced in litigating class actions, civil rights claims, tort claims, and immigration matters.  Plaintiffs' counsel has adequate resources to commit to representing the Classes.

277.    Neither Plaintiffs nor their counsel have interests that might cause them not to vigorously pursue this action, or which irreconcilably conflict with the other members of the Classes.

278.    Plaintiffs seek the following relief and hereby demand a trial by jury for all matters so appropriate.

## CLAIMS

279.    Both the Child Class and the Parent Class assert all claims.

### FIRST CAUSE OF ACTION
### VIOLATION OF FIFTH AMENDMENT SUBSTANTIVE DUE PROCESS – FORCIBLE SEPARATION OF FAMILY UNITS

### Against All Defendants

280.    Plaintiffs incorporate the allegations of Paragraphs 1 through 279 as if the same were fully set forth herein.

281.    At all relevant times, all Defendants were federal actors and were acting under color of federal law.

282.    The Due Process Clause of the Fifth Amendment states that no person will be "deprived of life, liberty, or property, without due process of law."

283.    Plaintiffs and Class Members have a substantive liberty interest under the Due Process Clause in remaining together as a family.  A parent's right to the care and custody of his or her child is a fundamental liberty interest.  A child's right to the care of his or her parent is a fundamental liberty interest.

284.    Forcible family separations violated the Due Process Clause because they furthered no legitimate purpose, let alone a compelling one.

285.    In addition to physical separation, family members were deprived in whole or in part of the ability to communicate by phone or otherwise while separated.  This additional deprivation furthered no legitimate purpose, let alone a compelling one.

286.    Further, Defendants' failure to reunite parents and children after separations in a timely manner violated the Due Process Clause because it furthered no legitimate purpose, let alone a compelling one.

287.    Defendants also violated the Due Process Clause of the Fifth Amendment by failing to maintain personal information regarding detainees in immigration custody that was necessary for the reunification of Plaintiffs and Class Members.  Defendants were aware of the significant problems caused by failing to maintain such personal information. Defendants' failure to maintain this personal information violated the Due Process Clause because it furthered no legitimate purpose, let alone a compelling one.

288.    Defendants have developed, adopted, implemented, enforced, sanctioned, encouraged, condoned, and acquiesced to a pattern, practice, or custom of violating the clearly established Fifth Amendment due process rights of Plaintiffs and Class Members by forcibly separating and then delaying reunification of families while in immigration detention, depriving family members in whole or in part of the ability to communicate by phone or otherwise while separated, and failing to maintain personal information regarding detainees in immigration custody that was necessary for the reunification of Plaintiffs and Class Members.

289.    Defendants' conduct shocks the conscience, interferes with rights implicit in the concept of ordered liberty, and demonstrates their deliberate indifference to the violation of Plaintiffs' and Class Members' constitutional right to due process.

290.    Plaintiffs and Class Members have suffered harm as a result of Defendants' due process violations.

**SECOND CAUSE OF ACTION**
**VIOLATION OF FIFTH AMENDMENT SUBSTANTIVE DUE PROCESS –**
**FAILURE TO PROVIDE ADEQUATE HEALTH CARE**

**Against Defendants Nielsen, Kelly, Homan, Vitiello, Albence, Cissna,**
**McAleenan, Morgan, Azar, Lloyd, Provost, John/Jane Doe DHS Defendants,**
**and John/Jane Doe HHS/ORR Defendants**

291.    Plaintiffs incorporate the allegations of Paragraphs 1 through 290 as if the same were fully set forth herein.

292.    At all relevant times, all Defendants named in this claim were federal actors and were acting under color of federal law.

293.    The Due Process Clause of the Fifth Amendment states that no person will be "deprived of life, liberty, or property, without due process of law."

294.    Plaintiffs and Class Members have a substantive liberty interest under the Due Process Clause in receiving adequate health care while in the custody of the Defendants named in this claim.

295.    The Defendants named in this claim demonstrated deliberate indifference to Plaintiffs' and Class Members' safety and well-being by failing to provide adequate health care.

296.    Although the Defendants named in this claim were aware of the severe harm that their conduct caused to the health of Plaintiffs and Class Members, they failed to provide adequate health care.  Among other failures, the Defendants named in this claim

failed to provide adequate mental health services in light of the trauma experienced by Plaintiffs and Class Members.

297.    The failure of the Defendants named in this claim to provide adequate health care violated substantive due process because it furthered no legitimate purpose, let alone a compelling one.

298.    The Defendants named in this claim have developed, adopted, implemented, enforced, sanctioned, encouraged, condoned, and acquiesced to a pattern, practice, or custom of violating the clearly established Fifth Amendment due process rights of Plaintiffs and Class Members by failing to provide adequate health care to Plaintiffs and Class Members while in custody.

299.    The conduct of the Defendants named in this claim shocks the conscience, interferes with rights implicit in the concept of ordered liberty, and demonstrates their deliberate indifference to the violation of Plaintiffs' and Class Members' constitutional right to due process.

300.    Plaintiffs and Class Members have suffered harm as a result of the due process violations of the Defendants named in this claim.

### THIRD CAUSE OF ACTION
#### VIOLATION OF FIFTH AMENDMENT SUBSTANTIVE DUE PROCESS – PUNITIVE TREATMENT

### Against All Defendants

301.    Plaintiffs incorporate the allegations of Paragraphs 1 through 300 as if the same were fully set forth herein.

302.    At all relevant times, all Defendants were federal actors and were acting under color of federal law.

303.    The Due Process Clause of the Fifth Amendment states that no person will be "deprived of life, liberty, or property, without due process of law."

304.   Plaintiffs and Class Members have a substantive liberty interest under the Due Process Clause in not being subjected to punitive treatment without due process.

305.   Defendants separated the families of Plaintiffs and Class Members for the purpose of punishing them, including by forcibly separating and then delaying reunification of families while in immigration detention, threatening indefinite separation, failing to provide meaningful information to parents and children regarding each other's locations and well-being, failing to provide a reliable or ready access to means of communication with each other, and/or subjecting Plaintiffs and Class Members to abusive conditions.

306.   The treatment inflicted by Defendants on Plaintiffs and Class Members served no legitimate purpose.

307.   Defendants have developed, adopted, implemented, enforced, sanctioned, encouraged, condoned, and acquiesced to a pattern, practice, or custom of inflicting punishment on Plaintiffs and Class Members in violation of the Fifth Amendment.

308.   Defendants' conduct shocks the conscience, interferes with rights implicit in the concept of ordered liberty, and demonstrates their deliberate indifference to the violation of Plaintiffs' and Class Members' constitutional right to due process.

309.   Plaintiffs and Class Members have suffered harm as a result of the due process violations of Defendants.

### FOURTH CAUSE OF ACTION
### VIOLATION OF FIFTH AMENDMENT PROCEDURAL DUE PROCESS –
### FAMILY SEPARATIONS WITHOUT NOTICE OR OPPORTUNITY TO BE HEARD

**Against Defendants Sessions, Nielsen, Kelly, Homan, Vitiello, Albence, Cissna, McAleenan, Morgan, Hamilton, Provost, and John/Jane Doe DHS Defendants**

310.   Plaintiffs incorporate the allegations of Paragraphs 1 through 309 as if the same were fully set forth herein.

311.    At all relevant times, all Defendants named in this claim were federal actors and were acting under color of federal law.

312.    The Due Process Clause of the Fifth Amendment states that no person will be "deprived of life, liberty, or property, without due process of law."

313.    The Due Process Clause of the Fifth Amendment protects the right of every person in the United States to a fair hearing if a person is deprived of life, liberty, or property.

314.    Forcible family separations at immigration detention centers deprived Plaintiffs and Class Members of their liberty and were conducted without notice or opportunity to be heard.

315.    The Defendants named in this claim have developed, adopted, implemented, enforced, sanctioned, encouraged, condoned, and acquiesced to a pattern, practice, or custom of violating the clearly established Fifth Amendment due process rights of Plaintiffs and Class Members by forcibly separating families while in immigration detention without notice or opportunity to be heard.

316.    The conduct of the Defendants named in this claim shocks the conscience, interferes with rights implicit in the concept of ordered liberty, and demonstrates the deliberate indifference of the Defendants named in this claim to the violation of Plaintiffs' and Class Members' constitutional due process rights.

317.    Plaintiffs and Class Members have suffered harm as a result of the due process violations of the Defendants named in this claim.

### FIFTH CAUSE OF ACTION
### VIOLATION OF THE FIFTH AMENDMENT EQUAL PROTECTION

### Against All Defendants

318.    Plaintiffs incorporate the allegations of Paragraphs 1 through 317 as if the same were fully set forth herein.

319.   At all relevant times, all Defendants were federal actors and were acting under color of federal law.

320.   The Due Process Clause of the Fifth Amendment states that no person will be "deprived of life, liberty, or property, without due process of law."

321.   The Fifth Amendment prohibits Defendants from intentionally discriminating against Plaintiffs and Class Members on the basis of race, ethnicity, and/or national origin.

322.   Defendants' conduct in connection with the forcible separation of families and the prolonged failure to reunify parents and children was intentionally applied to and disparately impacted families arriving from Central America and is unconstitutional because it burdens a fundamental right of Plaintiffs and Class Members and was motivated by intentional discrimination and/or animus based on race, ethnicity, and/or national origin.

323.   Forcible family separation furthered no legitimate purpose, let alone a compelling one.

324.   Defendants developed, adopted, implemented, enforced, sanctioned, encouraged, condoned, and acquiesced to a pattern, practice, or custom of violating the Fifth Amendment's equal protection guarantee by forcibly separating families because of their race, ethnicity, and/or national origin.

325.   Defendants' conduct shocks the conscience, interferes with rights implicit in the concept of ordered liberty, and demonstrates their deliberate indifference to the violation of Plaintiffs' and Class Members' constitutional right to due process.

326.   Plaintiffs and Class Members have suffered harm as a result of Defendants' due process violations.

- 71 -

**SIXTH CAUSE OF ACTION**
**VIOLATION OF THE FOURTH AMENDMENT –**
**PROTECTION FROM UNLAWFUL AND UNREASONABLE SEIZURES**

**Against Defendants Sessions, Nielsen, Kelly, Homan, Vitiello, Albence, Cissna,**
**McAleenan, Morgan, Hamilton, Provost, and John/Jane Doe DHS Defendants**

327.    Plaintiffs incorporate the allegations of Paragraphs 1 through 326 as if the same were fully set forth herein.

328.    The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

329.    At all relevant times, all Defendants named in this claim were federal actors and were acting under color of federal law.

330.    The Fourth Amendment protects Plaintiffs and Class Members from unlawful seizures without probable cause and seizures that continue for an unreasonable amount of time once any probable cause justifying a stop or detention ends.

331.     By separating children from their parents and continuing to keep children in immigration detention, apart from their parents and without their parents' consent, the Defendants named in this claim effectuated an unreasonable seizure in violation of the Fourth Amendment.

332.    The Defendants named in this claim planned, conducted, acquiesced to, or were willfully blind to the manner in which Plaintiffs and Class Members were seized through the use of threats, coercion, duress, and the use of false information, which the Defendants named in this claim knew or should have known would violate Plaintiffs' and Class Members' constitutional rights.

333.    The Defendants named in this claim planned, conducted, acquiesced to, or were willfully blind to the failure to create or implement a plan for reunification of separated parents and children, including failing to properly track personal identifying

information, in contravention of the law governing the release of children detained in immigration custody.

334.   As a result of these actions and inactions by the Defendants named in this claim, the seizures lasted for an unreasonable duration, and thereby violated Plaintiffs' and Class Members' constitutional rights.

335.   The Defendants named in this claim acted intentionally in failing to protect and preserve Plaintiffs' and Class Members' constitutional rights or, at a minimum, the Defendants named in this claim were knowingly indifferent to the likely consequences of their actions.

336.   Plaintiffs and Class Members have suffered and continue to suffer harm and injury as a result of violations of the Fourth Amendment by the Defendants named in this claim.

### SEVENTH CAUSE OF ACTION
### CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
### IN VIOLATION OF 42 U.S.C. § 1985(3)

### Against the Conspiracy Defendants

337.   Plaintiffs incorporate the allegations of Paragraphs 1 through 336 as if the same were fully set forth herein.

338.   The Conspiracy Defendants are each persons who at all relevant times have been located in a State or Territory of the United States.

339.   The Conspiracy Defendants conspired with themselves and others, in one or more conspiracies, to deprive Plaintiffs and Class Members, either directly or indirectly, of equal protection of the laws, or of equal privileges and immunities under the laws, or to prevent or hinder others from giving or securing equal protection of the laws for Plaintiffs and Class Members.

340.    The Conspiracy Defendants engaged in overt acts in furtherance of their conspiracy by implementing, enforcing, ordering, condoning, sanctioning, or encouraging the forcible separation of minor children from their parents without a demonstration in a hearing that the parent was unfit or presented a danger to that child.

341.    The Conspiracy Defendants' actions against Plaintiffs and Class Members were driven by discriminatory animus and were undertaken because of the race, ethnicity, and/or national origin of Plaintiffs and Class Members, who are overwhelmingly from Central America.

342.    The Conspiracy Defendants' unlawful conduct caused Plaintiffs and Class Members to be injured in their person or property or to be deprived of rights protected by the Constitution.  As a result of Defendants' unlawful conspiracy, Plaintiffs and Class Members have suffered harm, including emotional suffering and pain, mental anguish, inconvenience, loss of enjoyment of life, monetary damages, and being deprived of their constitutionally protected rights to substantive and procedural due process and equal protection.

## EIGHTH CAUSE OF ACTION
### REFUSAL OR NEGLECT TO PREVENT OR AID IN PREVENTING CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS IN VIOLATION OF 42 U.S.C. § 1986

### Against All Defendants

343.    Plaintiffs incorporate the allegations of Paragraphs 1 through 342 as if the same were fully set forth herein.

344.    Plaintiffs plead this cause of action against each of the Conspiracy Defendants in the alternative to the Sixth Cause of Action asserted against each of the Conspiracy Defendants.

345.    Defendants are each persons who at all relevant times have been located in a State or Territory of the United States.

346.    Defendants knew that the Conspiracy Defendants conspired to, and did in fact, take actions that violated Plaintiffs' and Class Members' constitutionally protected rights.  Defendants had the power to prevent or aid in the prevention of the commission of the Conspiracy Defendants' actions to deprive Plaintiffs and Class Members of their constitutionally protected rights in violation of 42 U.S.C. § 1985, but failed to do so.

347.    Plaintiffs and Class Members have suffered harm, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, monetary damages, and being deprived of their constitutionally protected rights to substantive and procedural due process and equal protection as a result of the unlawful conspiracy, which Defendants knew of but neglected or refused to prevent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that this Court:

A.    Enter an order certifying both the Child Class and the Parent Class under Fed. R. Civ. P. 23(a) and 23(b)(1) or 23(b)(3);

B.    Enter an order appointing Plaintiffs as the class representatives and Plaintiffs' counsel as class counsel for both Classes;

C.    Enter judgment in favor of Plaintiffs and the Classes and against the respective Defendants on all counts of the Complaint;

D.    Award compensatory damages to Plaintiffs and the Classes for the harms that they suffered as a result of Defendants' unconstitutional and unlawful conduct;

E.    Award punitive damages in favor of the Classes against Defendants;

F.    Order the establishment of a recovery fund to provide for health services to Class Members;

G.    Award pre- and post-judgment interest;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

H.    Award Plaintiffs their costs and attorneys' fees; and

I.    Award such other and further relief as the Court deems just and equitable.

Respectfully submitted,


Dated:  October 3, 2019                    By:     /s/Marty Lieberman
Lee Gelernt*                                        Marty Lieberman
Judy Rabinovitz*                                    ACLU FOUNDATION OF
Anand Balakrishnan*                                 ARIZONA
Daniel A. Galindo*                                  3707 N. 7th Street, Suite 235
AMERICAN CIVIL LIBERTIES                            Phoenix, AZ 85014
UNION FOUNDATION                                    Tel. (602) 650-1854
IMMIGRANTS' RIGHTS PROJECT                          mlieberman@acluaz.org
125 Broad St., 18th Floor
New York, NY 10004
Tel. (212) 549-2660
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

Alexander A. Reinert*                      Geoffrey R. Chepiga*
55 Fifth Avenue, Room 1005                 Jacqueline P. Rubin*
New York, NY  10003                        Emily Goldberg*
Tel. (212) 790-0403                        Hallie S. Goldblatt*
areinert@yu.edu                            Steven C. Herzog*
                                           PAUL, WEISS, RIFKIND, WHARTON
                                           & GARRISON LLP
                                           1285 Avenue of the Americas
                                           New York, NY 10019-6064
                                           Tel. (212) 373-3000
                                           gchepiga@paulweiss.com
                                           jrubin@paulweiss.com
                                           egoldberg@paulweiss.com
                                           hgoldblatt@paulweiss.com
                                           sherzog@paulweiss.com

* *Pro hac vice applications forthcoming*   *Attorneys for Plaintiffs A.I.I.L., on behalf
                                           of herself and her minor children, J.A.H.I.
                                           and M.E.H.I.; L.L.H.O., on behalf of
                                           herself and her minor child, K.E.O.H.;
                                           J.L.V.A., on behalf of himself and his
                                           minor child, D.S.V.H.; J.I.S., on behalf of
                                           himself and his minor child, B.L.S.P.; and
                                           J.J.P.B., on behalf of himself and his
                                           minor child, A.E.P.F.*

- 77 -